UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN E. BOYLE,
        Plaintiff,

                                        CIVIL ACTION NO.
        v.                              09-11435-MBB

BARNSTABLE POLICE DEPARTMENT,
TOWN OF BARNSTABLE, JOHN KLIMM,
Town Manager, CHIEF JOHN FINNEGAN
(retired), CHIEF PAUL MCDONALD,
DETECTIVE SGT. JOHN F. MURPHY, SGT.
ARTHUR CAIDO and SGT. RICHARD MORSE,
        Defendants.


**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 25)**

**September 22, 2011**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
(Docket Entry # 25) filed by defendants Barnstable Police
Department, Town of Barnstable, John Klimm ("Klimm"), Chief John
Finnegan (retired) ("Chief Finnegan"), Chief Paul McDonald
("Chief McDonald"), Detective Sergeant John F. Murphy ("Murphy"),
Sergeant Arthur Caido ("Caido") and Sergeant Richard Morse
("Morse") (collectively:  "defendants") pursuant to Rule 56, Fed.
R. Civ. P. ("Rule 56").


PROCEDURAL BACKGROUND

On August 28, 2009, plaintiff John E. Boyle ("Boyle") filed
a verified complaint (Docket Entry # 1) against defendants in

which he raises various federal claims under 42 U.S.C. § 1983
("section 1983"). Count One alleges that defendants violated
Boyle's Fifth and Fourteenth Amendment rights by retaliating
against him for exercising his First Amendment right to free
speech. Count Two alleges that defendants violated Boyle's Fifth
and Fourteenth Amendment rights by conspiring against him in
violation of section 1983 and 42 U.S.C. § 1985 ("section 1985").
Count Three alleges that defendants violated Boyle's Fifth and
Fourteenth Amendment rights by refusing to prevent or neglecting
to prevent harassment, a malicious prosecution and conspiracy
targeting Boyle. The count also alleges that Barnstable Police
Department and the Town of Barnstable had an official policy or
custom of failing to instruct and supervise Caido, Morse and
Finnegan to refrain from maliciously harassing and prosecuting
citizens and from conspiring to deprive citizens of their
constitutional rights. In addition to the aforementioned federal
claims, Boyle raises state law claims against defendants for
malicious prosecution (Count Four); abuse of process (Count
Five); conspiracy (Count Six); intentional infliction of
emotional distress (Count Seven); and libel, slander and
defamation (Count Eight).

Defendants move for summary judgment on both the federal and
state law claims. Defendants additionally seek to dismiss Murphy
and Chief McDonald because the complaint does not make any

specific factual allegations against them.  Defendants also seek dismissal of the Barnstable Police Department because it is not a legal entity subject to suit and dismissal of the Town of Barnstable because a municipality cannot incur liability under a theory of respondeat superior.  Finally, defendants submit that the individual defendants are subject to qualified immunity.

On March 22, 2011, this court held a hearing and took the motion for summary judgment (Docket Entry # 25) under advisement.

## STANDARD OF REVIEW

Summary judgment is designed "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007) (citation and internal quotation marks omitted).  When the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the nonmoving party."  Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the

suit under the applicable law." Id.

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." DeNovellis v. Shalala, 124 F.3d 298, 306 (1ˢᵗ Cir. 1997) (citation, internal brackets and internal quotation marks omitted). "After such a showing, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Hinchey v. Nynex Corp., 144 F.3d 134, 140 (1ˢᵗ Cir. 1998) (citation and internal quotation marks omitted).

The nonmoving party, who bears the ultimate burden of proof, may not rest on allegations in his briefs, see Borshow Hosp. & Med. v. Cesar Castillo, 96 F.3d 10, 14 (1ˢᵗ Cir. 1996), "but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1ˢᵗ Cir. 1995). Where, as here, a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. See Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1ˢᵗ Cir. 1991).

Defendants submit a LR. 56.1 statement of undisputed facts.

Uncontroverted statements of fact in the LR. 56.1 statement
comprise part of the summary judgment record.[1]  See Cochran v.
Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the
plaintiff's failure to contest date in LR. 56.1 statement of
material facts caused date to be admitted on summary judgment);
Stonkus v. City of Brockton School Department, 322 F.3d 97, 102
(1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed
material facts that the plaintiff failed to controvert); see also
Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d
216, 225 n.7 (1st Cir. 2003) (citing principle that "'[p]ro se
status does not insulate a party from complying with procedural
and substantive law'").  The court also examines the facts in a
light most favorable to the non-moving party and resolves any
reasonable inferences in that party's favor.  See Dasey v.
Anderson, 304 F.3d 148, 153 (1st Cir. 2002).

Construing the facts in Boyle's favor for the purpose of
adjudicating the summary judgment motion, they show the
following.

FACTUAL BACKGROUND[2]

Boyle, a longtime resident of Hyannis, Massachusetts, served

---

[1]  Statements of law are not considered.

[2]  Citations to the summary judgment record are provided
primarily only for direct quotations.

on the Barnstable Town Council for six years.  (Docket Entry # 1, ¶ 1).  At all times relevant to this action, Boyle was the owner and chief executive officer of King's Coach, Inc. ("King's Coach"), a sedan, van and limousine service provider licensed in the Town of Barnstable.  (Docket Entry # 30, ¶ 1).  The instant action arises out of events between Boyle and defendants in connection with the licensing and operation of King's Coach in 2006.

The Town of Barnstable Rules and Regulations for the Regulation of Taxi Cabs and the Operation Thereof ("Rules and Regulations") dictate that an individual must obtain a permit from the Barnstable Town Manager in order to operate a livery business in the Town of Barnstable.[3]  (Docket Entry # 30, ¶ 2; Docket Entry # 33, Ex. 2).  In order to acquire a permit, which the Rules and Regulations also refer to as "a vehicle for hire license," a business must have its vehicles inspected and pay a fee.  (Docket Entry # 30, ¶ 2; Docket Entry # 33, Ex. 2).  Section 21 of Massachusetts General Laws chapter 40 ("section 21") allows towns such as Barnstable to prescribe such ordinances and bylaws and affix monetary penalties not exceeding a certain amount for any breach.  Mass. Gen. L. Ch. 40, § 21.  The permit

---

[3]  The Rules and Regulations also require any operator of a vehicle for hire must also have a vehicle for hire license. (Docket Entry # 33, Ex. 2).  Footnote number 28 sets out the relevant language.

also designates the number of vehicles the business may use under the permit. (Docket Entry # 33, Ex. 2). The Rules and Regulations also provide that "the Chief of Police of the Town of Barnstable or any person or persons so designated by the Chief of Police" may act as the examiner for the regulations. (Docket Entry # 30, ¶ 8; Docket Entry # 33, Ex. 2). Pursuant to the Rules and Regulations, a vehicle for hire license "shall be valid for such term as the Examiner shall determine." (Docket Entry # 32, Ex. 2; Docket Entry # 33).

The examiner may suspend or revoke a license at any time if he believes the license holder violated any of the Rules and Regulations. (Docket Entry # 30, ¶ 8; Docket Entry # 32; Docket Entry # 33, Ex. 2). The examiner must, however, notify the license holder of the suspension or revocation in writing as well as inform the licensee of his right to a hearing before the Town Manager. (Docket Entry # 32; Docket Entry # 33, Ex. 2). "A request for a hearing [however] shall not delay any suspension or revocation." (Docket Entry # 33, Ex. 2).

Boyle founded King's Coach in April of 2000. (Docket Entry # 1, ¶ 2). At its peak, the company owned 20 vehicles and employed 35 drivers and eight office staff. (Docket Entry # 1, ¶ 2). In 2004 and 2005, King's Coach raised $980,000 and $880,000 in revenues, respectively. (Docket Entry # 1, ¶ 2). Boyle also owned and operated Shuttle King, "a shared ride shuttle service

operating in 40 cit[ies] and towns" in Massachusetts.  (Docket

Entry # 1, ¶ 2).  The Department of Telecommunications and Energy

licensed Shuttle King, not the Town of Barnstable.[4]  (Docket

Entry # 1, ¶ 2).  On August 18, 2005, Boyle purchased Five Star

Enterprises, Inc. ("Five Star"), a "rubbish and demolition and

construction collection service" operating in Falmouth,

Massachusetts ("Falmouth"), from a court appointed receiver.[5]

(Docket Entry # 1, ¶ 4).

On November 16, 2005, Thomas Geiler ("Geiler"), the Town of

Barnstable licensing agent, notified Boyle that he must have the

livery vehicles inspected at the Barnstable police station on

December 13 or 14, 2005, in order to obtain 2006 permits for

King's Coach.  (Docket Entry # 30, ¶ 4; Docket Entry # 26, Ex.

_____

[4]  The complaint does not identify the location of the
"Department of Telecommunications and Energy."  (Docket Entry #
1, ¶ 2).  The Shuttle King licenses are not at issue in this
case.

[5]  Boyle won the right to purchase Five Star by sealed bid.
(Docket Entry # 1, ¶ 4).  He began operating the business on June
9, 2005, in an attempt to preserve the company's value.  (Docket
Entry # 1, ¶ 3).
    The company was being sold at least in part due to a
resurgence of media interest in Melvin Rein ("Rein"), the
company's previous owner, following the unsolved murder of his
wife.  (Docket Entry # 1, ¶ 6).  Boyle began assisting the police
with the investigation thus having access to non-public
information.  (Docket Entry # 1, ¶ 9).  When media outlets asked
Boyle for his input, Boyle provided "scenarios that ran counter
to prevailing thought in law enforcement and published accounts
in the local paper."  (Docket Entry # 1, ¶ 11).

11).  Boyle did not submit the vehicles for inspection on either date.  On December 20, 2005, the Town of Barnstable Office of Regulatory Services ("Office of Regulatory Services") contacted Boyle and advised him that the permits were in jeopardy of not being renewed.  (Docket Entry # 11, ¶ 10).  Boyle instead applied for a limousine license in the Town of Falmouth with the hope of consolidating his business operations there.  (Docket Entry # 1, ¶ 12).  In December 2005, Falmouth Town Manager Whitenour ("Whitenour") notified Boyle that, "King's Coach could not obtain a license in Falmouth due to prejudice of then Falmouth Police Chief David Cusolito."  (Docket Entry # 1, ¶ 12).  Under Whitenour's direction, Boyle withdrew the license application. (Docket Entry # 1, ¶ 12).

Due to ongoing bad publicity and "financial considerations," Boyle placed King's Coach and Five Star up for sale.[6]  (Docket Entry # 1, ¶ 13).  He sold Five Star on or about May 1, 2006.

Boyle also "contacted the Licensing Division of Barnstable who agreed to allow Boyle an extension on renewing his limousine license because of a potential sale."[7]  (Docket Entry # 1, ¶ 14).

_____

[6]  Boyle does not specify when he placed King's Coach up for sale.  The record includes, however, a letter from a potential buyer dated October 28, 2005, in which the buyer informed Boyle he would be unable to purchase the business at that time. (Docket Entry # 32, Ex. 9).

[7]  According to defendants, the Office of Regulatory Services contacted Boyle on December 20, 2005, to inform him that his licenses were in "jeopardy of not being renewed."  (Docket

Boyle met with Thomas Geiler ("Geiler"), the Town of Barnstable licensing agent, at least three times regarding the extension. (Docket Entry # 1, ¶ 15).  Geiler assured Boyle that "things were OK" and advised him to renew his licenses "at some point." (Docket Entry # 1, ¶ 15).  Relying on Geiler's assurances, Boyle continued operating King's Coach.  (Docket Entry # 1, ¶ 15; Docket Entry # 32, p. 9).

In a letter dated June 5, 2006, the Office of Regulatory Services warned Boyle that if he did not renew his permits by June 20, 2006, the permits would be considered "null and void." (Docket Entry # 33, Ex. 1).  The letter extended Boyle's permits and notified him that the Town "considered his permits to be valid at least until June 20, 2006."[8]  (Docket Entry # 32, pp. 4, 8-10).  The Office of Regulatory Services, however, sent the letter to an address Boyle had not occupied in over four years. (Docket Entry # 1, ¶ 38).  Unaware of the deadline until

_____

Entry # 30, ¶ 5).  The Barnstable Office of Regulatory Services then gave Boyle until January 20, 2006, to have his vehicles inspected and licenses renewed.  (Docket Entry # 30, ¶ 5; Docket Entry # 26, Ex. 11, ¶ 10).

Boyle argues that such a deadline was never set and notes that the only evidence proffered to support it is the licensing agent's affidavit (Docket Entry # 26, Ex. 11).  (Docket Entry # 32, p. 8).  Boyle also complains that this court did not allow him to depose Geiler.  (Docket Entry # 32, p. 8).

[8]  Defendants maintain that the letter was a notification to Boyle that if he did not have his vehicles inspected by June 20, 2006 he would not be issued permits for 2006.  (Docket Entry # 30, ¶ 5).

September 2006,[9] Boyle did not have his vehicles inspected or his permits renewed by June 20, 2006.  (Docket Entry # 30, ¶ 6).

On June 28, 2006, Geiler sent an email to Sergeant Sean Sweeney ("Sergeant Sweeney") of the Barnstable Police Department informing him that King's Coach did not have valid 2006 permits.[10]  (Docket Entry # 26, Ex. 1; Docket Entry # 30, ¶ 7). "On or about July 2, 2006, the Barnstable Police Department stopped," towed and impounded a King's Coach vehicle for operating without a valid registration.  (Docket Entry # 30, ¶ 9).  It was later determined that a Massachusetts Turnpike Authority vehicle transponder had malfunctioned, causing the Fast Lane to mistakenly cancel the vehicle's registration without notice.  (Docket Entry # 30, ¶ 9).  Following this incident, Boyle telephoned Chief Finnegan[11] in an attempt to schedule a meeting to discuss the impounding of the vehicle and the allegations in a recent article published by the Cape Cod Times. (Docket Entry # 1, ¶ 26).  After approximately five days and numerous telephone calls, Chief Finnegan called Boyle back and

---

[9]  Boyle did not know about this letter until approximately mid-September 2006.  (Docket Entry # 1, ¶¶ 37 & 38).

[10]  Boyle argues that because he had been granted an extension on his permits through June 20, 2006, he was in fact licensed to operate his business in 2006.  (Docket Entry # 32).

[11]  In his capacity as a council member, Boyle had approved the hiring of Chief Finnegan in 1999.  (Docket Entry # 1, ¶ 26).

told him he was not available for a meeting.[12]   (Docket Entry #
1, ¶ 27).   Boyle made similar attempts to contact the Town
Manager and Director of Licensing to no avail.   (Docket Entry #
1, ¶ 28).

On August 9, 2006, Caido, as the complainant, filed an
application for a criminal complaint against Boyle.   (Docket
Entry # 26, Ex. 2).[13]   At his deposition, Caido, the police
prosecutor along with Morse for the Barnstable Police Department
in 2006, described his role as presenting "the police reports and
facts to a magistrate" who "determine[s] if there is probable
cause to charge somebody."   (Docket Entry # 33, Ex. 5; Docket
Entry # 29, Ex. 15).   The Barnstable District Court ("the court")
issued a criminal complaint on August 31, 2006, charging Boyle
with two counts of violating a municipal bylaw or ordinance for
operating a limousine service without a license on July 10, 2006
and July 21, 2006, in violation of section 21.[14]   (Docket Entry #

---

[12]   Chief Finnegan has no recollection of any contact with
Boyle regarding his complaints against the Town of Barnstable or
the Barnstable Police Department.   (Docket Entry # 26, Ex. 13, ¶
4).

[13]   Like other applications, the above application spells
Caido's name as Caiado.   To avoid confusion, this court adheres
to the spelling in the complaint.

[14]   Boyle accuses Caido of not following his role of
submitting police reports and facts to a neutral magistrate to
determine probable cause.   (Docket Entry # 32, p. 14).   The
record belies the accusation.   Even assuming dubitante that the
complaint issued without the approval of a clerk magistrate,

12

26, Ex. 2; Docket Entry # 30, ¶ 10).  On February 20, 2007, Boyle pleaded guilty.  The court set November 15, 2007, as the end date of probation and issued a continuance without a finding.  (Docket Entry # 26, Ex. 2).  The court ordered Boyle to pay $200 in court costs, which he paid on June 19, 2007.  (Docket Entry # 26, Ex. 2).  At the end of a probationary period on November 15, 2007, the court discharged both counts and closed the case.  (Docket Entry # 26, Ex. 2).

On August 28, 2006, Morse, as the complainant, filed an application for a criminal complaint against Boyle for two offenses allegedly committed on July 17, 2006.[15]  (Docket Entry # 26, Ex. 3).  The application charged Boyle with one count of larceny under $250 in violation of Massachusetts General Laws chapter 260, section 30 ("section 30") and another count for violating a municipal bylaw or ordinance for operating a business without a license in violation of section 21.  (Docket Entry # 26, Ex. 3; Docket Entry # 30, ¶ 11).  Morse based the larceny count on allegations made by Richard Verling ("Verling")[16] that

---

Boyle still fails to show that Caido lacked probable cause at the time of the application for purposes of the malicious prosecution claim or that he acted with an ulterior purpose for purposes of the abuse of process claim.

[15]  Boyle cites and relies on these charges as a basis for relief.  See fn. 25.

[16]  Boyle refers to a "Richard Fisher" in the complaint and elsewhere.  Defendants submitted an exhibit that suggests Boyle

King's Coach charged his credit card $141.88 for a reservation he cancelled in advance. (Docket Entry # 26, Ex. 3). On February 20, 2007, the court dismissed the larceny count. Boyle pleaded guilty to the operating without a license charge on February 20, 2007. The court set November 15, 2007, as the end date for probation and continued the matter without a finding. (Docket Entry # 26, Ex. 3). The court also ordered Boyle to pay $100 for court costs, which Boyle paid on June 19, 2007. (Docket Entry # 26, Ex. 3). At the end of a probationary period on November 15, 2007, the court dismissed the operating without a license count and closed the case. (Docket Entry # 26, Ex. 3).

On August 29, 2006, Caido, as the complainant, filed an application for a criminal complaint against Boyle for two offenses allegedly committed on August 16, 2006.[17] (Docket Entry # 26, Ex. 4). The application charged Boyle with two offenses, the first a larceny over $250 in violation of section 30 and the second a violation of a municipal bylaw or ordinance for operating a business without a license in violation of section 21. On the same day, the court issued a criminal complaint charging Boyle with one count of larceny over $250 and one count

intended to name Richard Verling. (Docket Entry # 1, ¶ 34; Docket Entry # 26, Ex. 3). Boyle subsequently indicated that the two names refer to the same person. (Docket Entry # 32, p. 12).

[17] Boyle cites and relies on these charges as a basis for relief. See fn. 25.

of violating a municipal ordinance for operating a business without a license. (Docket Entry # 26, Ex. 4; Docket Entry # 30, ¶ 12; Docket Entry # 29, Ex. 15). Caido based the larceny charge on allegations made by Carmel Fisher ("Fisher") that King's Coach failed to pick her up at the Omni Parker House in Boston, Massachusetts but nevertheless charged her $407.20 for the unperformed services.[18] (Docket Entry # 26, Ex. 4; Docket Entry # 30, ¶ 12). On February 20, 2007, the court dismissed the charge of larceny and held a hearing on the charge of the operating without a license. (Docket Entry # 26, Ex. 4). Boyle acknowledged sufficient facts on the operating without a license charge and the court issued a continuance without a finding. (Docket Entry # 26, Ex. 4). The court assessed Boyle a $100 fee for court costs, which Boyle paid on June 19, 2007. (Docket Entry # 26, Ex. 4). At the end of a probationary period on November 15, 2007, the court dismissed the operating without a license count and closed the case. (Docket Entry # 26, Ex. 4).

---

[18] The police records include the details about the complaints Fisher made about the larceny to the Barnstable Police Department. On May 22, 2006, Fisher made a reservation with King's Coach for August 16, 2006. (Docket Entry # 1, ¶ 22; Docket Entry # 26, Ex. 4). The original charge was $417.18 but she received two credits of $4.99. (Docket Entry # 1, ¶ 22; Docket Entry # 26, Ex. 4). Fisher's credit card was charged on May 22, 2006. (Docket Entry # 1, ¶ 22). Fisher contacted the Barnstable police on August 21, 2006, and reported that "King's Coach never showed up." (Docket Entry # 26, Ex. 4). The complaint further notes that King's Coach suspended operations on July 26, 2006, i.e., several weeks before the scheduled pick up. Such facts indicate the presence of probable cause.

On October 3, 2006, Morse, as the complainant, filed an application for a criminal complaint against Boyle for four offenses allegedly committed on October 2, 2006. (Docket Entry # 26, Ex. 5). The court issued a criminal complaint on that same day charging Boyle with driving with a suspended license, operating a motor vehicle without an inspection, operating a motor vehicle without proper registration, and a number plate violation.[19] (Docket Entry # 26, Ex. 5; Docket Entry # 30, ¶ 14). On December 7, 2006, the court dismissed the driving with a suspended license charge and held a hearing on the remaining charges. (Docket Entry # 26, Ex. 5). At the conclusion of the hearing, the court found Boyle responsible for the remaining three offenses and issued civil assessments totaling $115. (Docket Entry # 26, Ex. 5; Docket Entry # 30, ¶ 14). On December 8, 2006, Boyle paid the fee and the court closed the case. (Docket Entry # 26, Ex. 5).

On November 2, 2006, Alan J. Green ("Green"), as the

---

[19] The police narrative authored by Barnstable Patrolman Timothy McPeck ("McPeck") reflects that McPeck pulled over a black sport utility vehicle ("SUV") with a malfunctioning plate light. McPeck ran the vehicle's registration and determined that the black SUV did not match the registration. When pulled over, Boyle could not produce the registration upon request but did produce his driver's license. Two other police officers arrived to assist McPeck. A registry check revealed that the license "was suspended for a payment default." (Docket Entry # 26, Ex. 5). Upon being informed, Boyle informed McPeck that his "'f****** license [was] not suspended.'" (Docket Entry # 26, Ex. 5). McPeck placed Boyle under arrest for the above noted charges.

complainant, filed an application for a criminal complaint

against Boyle for an offense allegedly committed on July 10,

2006.  (Docket Entry # 26, Ex. 6).  The court issued a criminal

complaint on December 7, 2006, charging Boyle with a failure to

obtain workers' compensation insurance.[20]  (Docket Entry # 26,

Ex. 6).  Following Boyle's admission to sufficient facts on March

15, 2007, the court issued a continuance without a finding.

(Docket Entry # 26, Ex. 6).  The court ordered Boyle to pay $750

in court costs, which he paid on March 14, 2008.  (Docket Entry #

26, Ex. 6).  At the end of a probationary period on July 8, 2008,

the court closed the case.  (Docket Entry # 26, Ex. 6).

On July 21, 2006, the Cape Cod Times published an article

that stated Boyle "is in trouble with former employees, the state

_____

[20]  Boyle filed an exhibit which he describes as "a MA
Department of Industrial Accidents investigator's report."
(Docket Entry # 1, ¶ 37).  The report provides a foundation for a
number of the claims.  It consists of a single page narrative of
events that took place on certain dates in connection with
Green's investigation of Boyle.  The entry for September 13,
2006, notes that Caido told Green, who Boyle identifies as a
"Department of Industrial accidents investigator" (Docket Entry #
32, p. 5), and "Asst. General Counsel Charles Crowley"
("Crowley") that he, i.e., Caido, did not "want us to drop
anything on this John Boyle because everybody in the department
knows all about [Boyle] and his going ons."  (Docket Entry # 26,
Ex. 9; Docket Entry # 33, Ex. 18).  The September 13, 2006 entry
also states that Green and Crowley went to the Barnstable
District Court for a scheduled arraignment which, at the request
of Boyle's attorney, the court rescheduled to November 1, 2006.
Green and Crowley then spoke with Caido who made the foregoing
statement.  (Docket Entry # 26, Ex. 9; Docket Entry # 33, Ex.
18).

attorney general's office, the town of Barnstable and would-be customers." (Docket Entry # 33, Ex. 22). The article detailed that Boyle operated King's Coach "illegally for nearly six months" and "allegedly left customers in the lurch." (Docket Entry # 33, Ex. 22). The article reported that, "The attorney general's fair labor division" issued two citations against Boyle for failing to pay wages and the court "processed a complaint against Boyle for failure to have workers compensation insurance." (Docket Entry # 33, Ex. 22). The article states that Boyle did not "renew his permit to run a livery business in Barnstable by" December 31, 2005, "as required" and includes Boyle's explanation that he did not have $1,500 in January for the license fee. (Docket Entry # 33, Ex. 22).

The Cape Cod Times published a follow up article on September 8, 2006, outlining the various allegations raised against Boyle and King's Coach. (Docket Entry # 33, Ex. 22). The article described Fisher and Verling's complaints against King's Coach "for allegedly charging their credit cards but not providing limo service." (Docket Entry # 33, Ex. 22). It also quoted similar allegations made by other King's Coach customers. (Docket Entry # 33, Ex. 22). The newspaper also reported that the Barnstable Police Department levied "four criminal complaints against [Boyle] . . . for allegedly operating his company King's

Coach without a livery license."[21]  (Docket Entry # 33, Ex. 22).

Boyle filed suit against the Cape Cod Times seeking $12,500,000

in damages for the "inaccurate, incorrect, misrepresented and

untrue" content of these articles.  (Docket Entry # 1, ¶ 25).

Boyle notes in the complaint that he would introduce

"approximately 30 plus criminal and administrative charges

against him" as to which he was found not guilty.  (Docket Entry

# 1, ¶ 39).  During one unidentified court proceeding, Boyle

states that "a Judge asked the prosecutor" why Boyle was here and

commented that, "[Boyle] has committed no crime."  (Docket Entry

# 1, ¶¶ 39 & 40).  The complaint, which is verified, also states

that the Barnstable Police Department "refused to assist, and,

further, outright avoided protecting [Boyle] and his family."

(Docket Entry # 1, ¶ 40).  For example, the Barnstable Police

Department did not assist him when someone loosened the lug nuts

on all four tires of his personal vehicle, stole the license

plates from all of King's Coach's vehicles, smashed a car through

---

[21]  Boyle proffers a generalized conclusion that defendants
met or communicated with one another, upon information and
belief, to "conspire against" him and King's Coach.  (Docket
Entry # 1, ¶ 29).  Boyle alleges that defendants utilized the
Cape Cod Times articles to conspire against him.  (Docket Entry #
1, ¶ 30).  Such conclusions do not constitute part of the summary
judgment record.  See Estate of Bennett v. Wainwright, 548 F.3d
155, 178 (1st Cir. 2008) (summary judgment appropriate on section
1983 conspiracy claim "where the nonmoving party rests merely on
conclusory allegations" and finding that the plaintiffs provided
"no evidence, either direct or circumstantial of an agreement
among defendants from which a reasonable jury could have inferred
a conspiracy among them to inflict harm upon the plaintiffs").

his fence and burglarized his office.  The police also failed to protect him from receiving threatening telephone calls.[22] (Docket Entry # 1, ¶ 40).

King's Coach suspended operations on July 26, 2006.  (Docket Entry # 1, ¶ 31).  Boyle asserts that the actions taken by the Barnstable Police Department and town officials caused the suspension of operations.

By letter dated November 4, 2009, Boyle wrote to the First Magistrate of the Barnstable District Court that "Police prosecutor Caido" was not dropping a criminal application scheduled for a December 4, 2009 hearing even though "ALL parties have rectified their differences."  (Docket Entry # 33, Ex. 17) (capitalization in original).  Boyle also noted he had requested a hearing on two citations issued by the Barnstable Board of Health that were not mailed to Boyle's correct address.  Boyle also advised the First Magistrate that Caido was "attempting to extract revenge on [him] by any means possible."  (Docket Entry # 33, Ex. 17).  By letter dated November 4, 2009, Boyle wrote to

---

[22] The Barnstable Police Department's failure to come to Boyle's aid does not provide sufficient evidence that Caido acted with an ulterior purpose in submitting an application for a criminal complaint for offenses allegedly occurring on August 16, 2006, or that Morse acted with an ulterior purpose in submitting an application for a criminal complaint for offenses allegedly occurring on July 17, 2006.

the Cape and Islands District Attorney in Barnstable, attached the foregoing letter and noted his belief that Caido was "attempting to use his position in a manner that is retaliatory" as well as unconstitutional. (Docket Entry # 33, Ex. 17). On December 15, 2009, Boyle transmitted by facsimile to a Cape and Islands Assistant District Attorney three requests submitted under the Massachusetts Public Records Law to the Barnstable Police Department dated August 31, 2009. The cover letter noted that Boyle had received a reply to only one of the requests and suggested that the failure to respond raised an inference of a spoilation of evidence.[23]

In a January 8, 2010 reply letter to Boyle, the Cape and Islands Assistant District Attorney stated that the office would defer any determination on Boyle's complaint about Caido pending conclusion of Boyle's civil litigation. The Cape and Islands Assistant District Attorney also provided Boyle the address of the Secretary of the Commonwealth's public records division which handles requests for public records. In a January 14, 2010 reply letter, Boyle complained about the deferral. (Docket Entry # 33,

---

[23] In pertinent part, the letter states that, "According to our conversation it would seem that they, by failing a lawful request, have conveniently allowed evidence to be destroyed. Why wouldn't they respond to each request?" (Docket Entry # 33, Ex. 20).

Ex. 17 & 20).


DISCUSSION

I.  <u>Murphy and Chief McDonald</u>

　　Defendants move to dismiss Chief McDonald and Murphy because they are not named in the complaint.  Boyle counters that "[c]ount 4, Paragraph 62 of the complaint reads, 'Defendants Town of Barnstable, Klimm, Chief Finnegan, Chief McDonald, Murphy, Caido and Morse are liable under the doctrine of respondent[sic] superior or partnership by estoppels [sic].'"  (Docket Entry # 32, p. 2).  The complaint, however, fails to name Murphy and Chief McDonald in count four, paragraph 62, or elsewhere except in the caption of the case.

　　Second, Boyle argues that each of the claims names "all defendants" thereby including Murphy and Chief McDonald which is true.  The complaint makes general references to "all the defendants" in the "wherefore" paragraphs and elsewhere states that "all defendants" are subject to section 1983, violated Boyle's rights, are liable to Boyle for compensatory damages, retaliated or conspired against him, caused Boyle injury or acted maliciously.  (Docket Entry # 1, ¶¶ 42-44, 46, 52, 54, 57, 59, 64-68, 70-71, 74-77, 80-83 & 85).  These statements, however, constitute no more than legal conclusions or conclusory statements and cannot withstand summary judgment.  <u>See</u> <u>Chiang v.</u>

22

Verizon New England Inc., 595 F.3d 26, 30 (1st Cir. 2010) (noting requirement to ignore "'conclusory allegations, improbable inferences, and unsupported speculation'" on summary judgment); Triangle Trading Company, Inc. v. Robroy Industries, Inc., 200 F.3d 1, 2 (1st Cir. 1999) (same); see, e.g., Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (averment that "'Defendant Arcilio Alvarado actively discriminated against plaintiff [sic] he was responsible for taking away his responsibilities for transferring him and was the one who clearly identified plaintiff as a member of the Popular Democratic Party' . . . merely repeats the conclusory allegations in the complaint" and therefore "does not establish a genuine issue of material fact"); Malloch v. Town of Hanover, 2011 WL 487787, *6 & n.8 (D.Mass. Feb. 7, 2011) (general reference to "'defendants' conduct'" with respect to "hostile work environment claim" without "any specific actions by Barron supportive of [the] claim" did not avoid summary judgment). The complaint is likewise bereft of any facts that apply to Murphy or to Chief McDonald.

Third, Boyle argues he was prevented from deposing Murphy or Chief McDonald.[24] Boyle asserts that had he been allowed to

---

[24] On December 15, 2010, this court heard argument on defendants' motion for a protective order (Docket Entry # 21) relative to a number of depositions Boyle noticed for December 30 and 31, 2010, including those of Murphy and Chief McDonald. This

conduct the requested discovery, he would have been able to show "a strong supervisory relationship to other named defendants and a direct wilful participation in the allegations made in the complaint." (Docket Entry # 32).

Rule 56(d), formerly Rule 56(f),[25] addresses the circumstance in which facts are not available to the summary judgment target. By its terms, the rule requires an affidavit or declaration. Rule 56(d), Fed. R. Civ. P. Boyle's pro se status does not insulate him from complying with Rule 56(d). See Kenda Corp. v. Pot O'Gold Money Leagues, 329 F.3d at 225 n.7 ("'Pro se status does not insulate a party from complying with procedural and substantive law'"). Boyle also fails to articulate a plausible basis for his belief that a supervisory relationship and/or wilful participation existed. Murphy and Chief McDonald are therefore subject to summary judgment.

## II. Barnstable Police Department and Town of Barnstable

Defendants also move to dismiss the section 1983 claims against the Town of Barnstable because a municipality cannot be subject to suit under section 1983 on a theory of respondeat superior. Defendants also argue there is no policy or custom

---

court required Boyle to pick three deponents. Boyle did not choose either Murphy or Chief McDonald.

[25] See Rule 56(d), Advisory Committee Notes, 2010 Amendment ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)"); Godin v. Schencks, 629 F.3d 79, 91 n.19 (1st Cir. 2010).

sufficient to provide the requisite link between the policy or custom and the unconstitutional conduct as required for section 1983 claims.

The doctrine that a municipality cannot incur liability under section 1983 based on respondeat superior is well established.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978) ("municipality cannot be held liable under § 1983 on a respondeat superior theory").  Instead, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 403 (1997).  Establishing municipal liability also requires a plaintiff to establish a direct link between a policy of the municipality and the alleged constitutional violation.  City of Canton v. Harris, 489 U.S. 378, 385-387 (1989); see Kennedy v. Town Of Billerica, 617 F.3d 520, 531 (1st Cir. 2010) ("Monell can impose municipal liability only for underlying, identifiable constitutional violations attributable to official municipal policy").  In Count Three, Boyle alleges the existence of an "official policy or custom" of failing "to instruct, supervise, control, and discipline" to prevent the harassment, malicious prosecution and conspiracy targeting Boyle.  Boyle fails, however, to set forth sufficient facts to avoid summary judgment as to the existence of such a custom or policy that promoted or fostered the alleged

harassment, malicious prosecution and/or conspiracy.[26]  Dismissal
of the section 1983 claims against the Town of Barnstable is
therefore appropriate.

Defendants additionally seek dismissal of the Barnstable
Police Department because a police department does not operate as
a separate legal entity from the municipality.  The legal
authority defendants provide, however, only applies to liability
under section 1983.  Defendants' failure to provide legal
authority outside the context of a section 1983 claim thereby
limits the motion to seeking summary judgment only on the section
1983 claims.  See LR. 7.1(b); see, e.g., Bose BV v. Zavala, 2010
WL 152072, *1 (D.Mass. Jan. 14, 2010) (failure to cite law
relevant to the claims provided basis to deny motion to dismiss
due to noncompliance with LR. 7.1(b)).

Like a municipality, a police department "cannot be held
liable in damages under § 1983 merely because it employs a
tortfeasor."  Malachowski v. City of Keene, 787 F.2d 704, 711
(1st Cir. 1986); accord Lumpkin v. Lucey, 2010 WL 1794400, *2
(D.Mass. May 4, 2010) ("a municipal police department is not

---

[26]  Count Three also sets out a failure to supervise claim
against Klimm.  Although defendants seek summary judgment on all
of the counts, they do not address the failure to supervise claim
against Klimm in Count Three.  The claim therefore survives
summary judgment at this point in time.  Defendants do not raise
Klimm's qualified immunity relative to the failure to supervise
claim.

subject to suit under Section 1983"); see also Henschel v. Worcester Police Dept., 445 F.2d 624, 624 (1st Cir. 1971) (dismissing section 1983 suit against police department because it is not a suable entity apart from the municipality).  The section 1983 claims against the Barnstable Police Department are therefore subject to summary judgment.

III.  Malicious Prosecution

Defendants move for summary judgment on the malicious prosecution claim (Count Four) because:  (1) Klimm and Chief Finnegan did not institute criminal proceedings against Boyle; and (2) Caido and Morse had probable cause to file the applications for the criminal complaints.[27]  Defendants argue

---

[27] The complaint describes two charges filed by Caido in one application and two charges filed by Morse in another application.  (Docket Entry # 1, ¶ 34).  As previously described, Caido filed charges for the alleged larceny of $407.20 from Fisher and the operating of a business without a license in violation of a municipal ordinance.  The charges arose out of conduct that took place on August 16, 2006.  (Docket Entry # 26, Ex. 4; Docket Entry # 1, ¶ 34).  Morse filed charges for the alleged larceny of $141.88 from Verling and the operating of a business without a license in violation of a municipal ordinance. The charges arose out of conduct that took place on July 17, 2006.  (Docket Entry # 26, Ex. 4; Docket Entry # 1, ¶ 34).

Although Boyle asserts in the complaint that he will introduce "30 plus" additional charges (Docket Entry # 1, ¶ 39), he has not filed these charges to date.  Defendants produced evidence of additional charges for offenses which, as described in the factual background, took place on July 10 and 21, 2006, and on October 2, 2006.  (Docket Entry # 26, Ex. 2, 5 & 6).  Boyle does not identify these offenses as the basis for the claims.  Accordingly, while this court considers these additional

27

that the court dismissed the larceny charges and Boyle admitted to sufficient facts or plead guilty to the charges of operating a business without a license. Boyle maintains that Klimm and Chief Finnegan are liable under a theory of vicarious liability and that Caido and Morse lacked probable cause to file the applications for the criminal complaints.

To prevail on a claim for malicious prosecution, a plaintiff must show that the defendants instituted the criminal prosecution. See Limone v. United States, 579 F.3d 79, 89 (1st Cir. 2009); Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (enumerating elements in prima facie case for malicious prosecution). Thus, there must be some involvement by the defendant in instituting the charges. Boyle's argument that vicarious liability applies is therefore misplaced.

It is nevertheless "well established that a person need not swear out a criminal complaint in order to be held answerable for malicious prosecution." Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991). Thus, in certain circumstances, "an individual who transmits untruthful information to an official with power to charge sometimes may be said to have instituted an ensuing criminal proceeding brought by that official." Limone v. U.S., 579 F.3d at 89. The summary judgment record, however, is devoid

charges, the discussion focuses on the four charges made by Caido and Morse for the alleged misconduct that took place on July 17 and August 16, 2006.

of facts connecting either Klimm or Chief Finnegan to the
criminal proceedings in a sufficient manner to allow a finder of
fact to find that either individual instituted the criminal
proceedings.  Accordingly, Klimm and Chief Finnegan are not
liable under the malicious prosecution claim in Count Four.

Turning to defendants' second argument, it is well
established that a plaintiff must set out sufficient facts that
the defendant acted without probable cause to succeed on a
malicious prosecution claim.  See Limone v. United States, 579
F.3d 79, 89 (1st Cir. 2009); see also Hartman v. Moore, 547 U.S.
250, 257 (2006) (courts should presume prosecutors commence
litigation on legitimate grounds).  "The probable cause
standard," however, presents "a 'relatively low threshold' for
police officers to establish."  Sietins v. Joseph, 238 F.Supp.2d
336, 375 (D.Mass. 2003) (citing White v. Town of Marblehead, 989
F.Supp. 345, 349 (D.Mass. 1997)).  Probable cause turns upon
"whether the defendant acted reasonably in swearing out a
complaint against the plaintiff on the basis of the information
and knowledge which he possessed at that time."  Lincoln v. Shea,
277 N.E.2d 699, 702 (Mass. 1972).  Probable cause "is 'such a
state of facts in the mind of the prosecutor as would lead a man
of ordinary caution and prudence to believe, or entertain an
honest and strong suspicion, that the person arrested is
guilty.'"  Id.; see also Zullo v. Town of Framingham, 2002 WL

1868147, *1 (Mass.App.Ct. 2002) (quoting <u>Lincoln</u>, 277 N.E.2d at 702).

Defendants also correctly maintain that a malicious prosecution claim requires the plaintiff to establish termination of the underlying proceedings in the plaintiff's favor.  <u>See</u> <u>Limone</u>, 579 F.3d at 89; <u>see</u> <u>also</u> <u>Britton v. Maloney</u>, 196 F.3d 24, 30 (1st Cir. 1999) ("[s]uccessful termination of the underlying action is a 'threshold requirement' of the claim" for malicious prosecution).  Defendants point out that Boyle either pled guilty or admitted to sufficient facts.  (Docket Entry # 26).

The complaint described four charges levied against Boyle: (1) the larceny perpetrated against Fisher in violation of section 30;[28] (2) the August 16, 2006 ordinance violation for operating a business without a license in violation of section 21;[29] (3) the larceny perpetrated against Verling in violation of

---

[28]  In pertinent part, section 30(1) provides, "Whoever . . . unlawfully, and with intent to steal or embezzle, converts ... the property of another . . . shall be guilty of larceny." Section 30(2) defines "property" to include money.  Although section 30 encompasses "larceny, larceny by false pretenses, and embezzlement," these offenses "have different required elements." <u>Commonwealth v. Mahoney</u>, 863 N.E.2d 951, 957 (Mass.App.Ct. 2007). "Traditional larceny requires that the defendant engage in the 'unlawful taking and carrying away of the personal property of another with the specific intent to deprive the person of the property permanently." <u>Id.</u>

[29]  "The power of cities and towns to enact ordinances and by-laws is derived both from the 'home rule' amendment to the Constitution of Massachusetts," Ma. Const. art. 89, "and express

30

section 30; and (4) the July 17, 2006 ordinance violation for operating a business without a license in violation of section 21.[30]

As to the first charge, the Barnstable Police Department learned about the alleged improper charges to Fisher's credit card when she contacted the department on August 21, 2006. On August 22, 2006, a police detective conducted another conversation with Fisher as part of the pre-filing investigation of the complaint. (Docket Entry # 26, Ex. 4). The facts provided gave rise to strong suspicion that Boyle had unlawfully taken money from Fisher without providing the service or a refund. Caido filed the charges against Boyle on August 29,

---

grants from the legislature," such as section 21. 18 Douglas A. Randall and Douglas E. Franklin, <u>Massachusetts Practice Series</u> § 15.1 (5th ed. 2006). As previously explained, section 21 gives towns the authority to "make such ordinances and by-laws" and to "affix penalties for breaches." Mass. Gen. L. Ch. 40, § 21. The relevant bylaw or ordinance in the Rules and Regulations mandates that, "no person shall engage in the business of transporting persons for hire in a vehicle without first having obtained a permit from the Town Manager." (Docket Entry # 33, Ex. 2). The Rules and Regulations also state that the license "shall be valid for such term as the Examiner shall determine." (Docket Entry # 33, Ex. 2). Geiler avers that operating licenses are "issued on an annual basis" and that Boyle did not have one for 2006. (Docket Entry # 26, Ex. 11; Docket Entry # 1, ¶ 15). Without providing a date, Boyle attests that he "contacted the Licensing Division of Barnstable who(sic) agreed to allow Boyle an extension on renewing his limousine license because of a potential sale." (Docket Entry # 1, ¶ 14).

[30] See footnote 25.

2006, after the Barnstable Police Department learned about the facts in the case. (Docket Entry # 26, Ex. 4, p. 2). Caido's reliance on the police records and the reports made by the victim provide the necessary probable cause to bring the charge. See Galvin v. McManus, 2011 WL 2738176, *1 (Mass.Super. April 20, 2011) ("information from an identified individual provides a reasonable belief that a crime was committed" and therefore "the pursuit of a criminal complaint against the plaintiff was supported by probable cause"); see also White v. Town of Marblehead, 989 F.Supp. at 350. As the summary judgment target, Boyle fails to provide facts to suggest that Caido lacked probable cause.

As to the second charge, the Barnstable Police Department knew that King's Coach's vehicles did not have a valid 2006 permit to operate as early as June 28, 2006, when Geiler emailed Sweeney. In fact, the email asked Sweeney to "make the patrol force aware that King's Coach has no valid 06 permits." (Docket Entry # 26, Ex. 1 & 11). Caido filed charges against Boyle thereafter on August 29, 2006, for operating a business without a license. (Docket Entry # 26, Ex. 4). On February 20, 2007, Boyle admitted to sufficient facts and the court continued the matter without a finding. Boyle's admission to sufficient facts contradicts his claims of innocence regarding the charge of violating a municipal bylaw or ordinance for operating a business

without a license.  Accordingly, the court did not terminate the

proceeding on this charge in Boyle's favor as a matter of law.

See Wynne v. Rosen, 464 N.E.2d 1348, 1351 (Mass. 1984);[31] see

also Britton v. Maloney, 196 F.3d at 31 (noting there is

"successful termination of the underlying action as long as the

circumstances 'compel[led] an inference that there existed a lack

of reasonable grounds to pursue the prosecution'") (quoting

Wynne, 464 N.E.2d at 1351); Simmons v. City of Brockton, 1994 WL

725181, *1 (D.Mass. Dec. 15, 1994) (dismissal of criminal case

when the plaintiff "stipulated that she would not run an illegal

boarding house in the future" was not favorable termination for

purposes of malicious prosecution claim).

As to the third charge, Verling independently contacted the

Barnstable Police on July 18, 2006, to complain about the

unauthorized charge on his credit card.  According to police

records, Verling spoke to a detective on July 18, 2006, and

explained he had made a reservation with King's Coach on July 12,

2006, for a July 18, 2006 pick-up at Logan Airport.  He later

canceled the pick-up by telephoning King's Coach and speaking to

---

[31]  As explained by the Massachusetts Supreme Judicial Court
in Wynne, a criminal prosecution terminates "in favor of the
plaintiff when the district attorney formally abandons the
criminal proceedings by a nolle prosequi or a motion to dismiss"
as long as "the reasons stated for the nolle prosequi or
dismissal [are] consistent with the innocence of the accused."
Wynne, 464 N.E.2d at 1351.  "The circumstances of the abandonment
must be compel an inference that there existed a lack of
reasonable grounds to pursue the prosecution."  Id.

a clerk who assured Verling he would note the cancellation and Verling would receive a credit for the existing July 17, 2006 charge of $141.88 for the July 18, 2006 pick-up.[32]  The police records also note that on August 7, 2006, Verling contacted his credit card company and "was advised that King's Coach had not sent in a notification to credit his account." (Docket Entry # 26, Ex. 3).  As a result of this information, Morse filed the application for the criminal complaint on August 29, 2006, charging Boyle with larceny under $250.  (Docket Entry 26, Ex. 3; Docket Entry # 28, ¶ 3).  Examining the totality of the circumstances, Morse had probable cause to file the application for a criminal complaint for the larceny charge as a matter of law.  See Galvin v. McManus, 2011 WL 2738176, at *1; see also White v. Town of Marblehead, 989 F.Supp. at 350.

As to the fourth charge, Morse filed the application for a criminal complaint charging Boyle for operating King's Coach without a license in violation of a municipal bylaw or ordinance. Boyle pleaded guilty to the charge on February 20, 2007.  The court set a probationary period and continued the matter without

---

[32]  Verling also canceled a July 21, 2006 pick-up which the clerk assured Verling he would note.  Verling  advised the detective that, upon contacting his credit card company on August 7, 2006, to verify the credit, he discovered a $327.68 charge by Lifestyle Transportation.  Verling then contacted King's Coach and discovered it had contracted with Lifestyle Transportation to do the July 21, 2006 pick-up notwithstanding Verling's cancellation.  Lifestyle Transportation agreed to credit the charge.  (Docket Entry # 26, Ex. 3).

a finding.  (Docket Entry # 26, Ex. 3).  Boyle's guilty plea
regarding the charge of violating a municipal bylaw or ordinance
for operating a business without a license contravenes his claim
of innocence.  Hence, insufficient facts exist to avoid summary
judgment relative to the required element that the proceedings
terminated in Boyle's favor.  See Alphagary Corp. v. Gitto, 2007
WL 1829396, *2 (Mass.Super. May 21, 2007) ("the initial or
underlying case is the criminal proceeding which did not end in
Newline's favor; it resulted in a guilty plea" and the malicious
prosecution "cause of action fails as a matter of law").

In sum, as the summary judgment target, Boyle fails to meet
his underlying burden of showing sufficient facts to avoid
summary judgment on the malicious prosecution elements of lack of
probable cause and termination in his favor.  Further, any claim
of malicious prosecution against Klimm and Chief Finnegan fails
to survive summary judgment given the absence of sufficient facts
that either instituted the criminal proceedings at issue.

IV.  Abuse of Process

Defendants seek summary judgment on the abuse of process
claim (Count Five) because:  (1) Klimm and Chief Finnegan did not
participate in any proceedings involving Boyle; and (2) Caido and
Morse did not have an improper motive.  Turning to the first
argument, an abuse of process claim requires that the defendants
participate in judicial proceedings against the plaintiff.  See

Piccone v. McLain, 720 F.Supp.2d 139, 146 (D.Mass. 2010) (citing

Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 563 (Mass.

2002)) (enumerating elements in prima facie claim for abuse of

process).  The summary judgment record does not include

sufficient facts to create a genuine issue concerning either

Klimm or Chief Finnegan's participation in the criminal

proceedings at issue.  Thus, Klimm and Chief Finnegan are not

liable under the abuse of process claim in Count Five.

Turning to the second argument, in order to establish an

abuse of process claim, a plaintiff must provide evidence of an

ulterior purpose.  See McCarthy v. City of Newburyport, 2007 WL

3171357, at *4 (1st Cir. Oct. 31 2007);[33] Piccone, 720 F.Supp.2d

at 146.  As recently reiterated by the Massachusetts Supreme

Judicial Court, an ulterior purpose exists when the defendant

uses process "'"to accomplish some ulterior purpose for which it

was not designed or intended, or which was not the legitimate

purpose of the particular process employed."'"  Psy-Ed Corp. v.

Klein, 947 N.E.2d 520, 534 (Mass. 2011) (quoting Quaranto v.

Silverman, 187 N.E.2d 859, 861 (Mass. 1963)).  The tort "'has

been described as a "form of coercion to obtain a collateral

advantage, not properly involved in the proceeding itself, such

as the surrender of property or the payment of money."'"  Fabre

_____

[33]  Rule 32.1, Fed.R.App.Pro., allows citations of
unpublished opinions issued on or after January 1, 2007.  See
also First Circuit Rule 32.1.0.

v. Walton, 781 N.E.2d 780, 783 n.3 (Mass. 2002). Filing a groundless claim "is relevant because it may "'tend to show that the process was used for an ulterior purpose.'" Psy-Ed Corp. v. Klein, 947 N.E.2d at 534 (quoting Fishman v. Brooks, 487 N.E.2d 1377, 1383 (Mass. 1986)). On the other hand, "the ulterior purpose element is not satisfied merely by a showing that a person commenced litigation knowing it was groundless." Psy-Ed Corp. v. Klein, 947 N.E.2d at 534; accord Empire Today, LLC v. National Floors Direct, Inc., 2011 WL 2161898, *8 (D.Mass. June 2, 2011) (filing "groundless claim or having an improper motive of 'vexation, harassment, or annoyance' is relevant but does not alone suffice to demonstrate ulterior purpose").

Boyle argues that defendants initiated process knowing it was groundless in revenge for "(a) Speaking publicly against an investigation, (b) Being the subject of libelous media coverage, (c) Addressing police officers in the same manner and effect in which they opted to address plaintiff, and (d) Political and personal reasons." (Docket Entry # 32, § III(D); Docket Entry # 1, ¶ 66). The first and second assertions do not allow a finder of fact to find ulterior purpose. There is little if any evidence that Caido or Morse knew about Boyle's comments regarding the unsolved murder.[34] The record fails to contain any specifics about the content of Boyle's scenarios that ran counter

---

[34] Footnote five sets out the media coverage.

to the prevailing thought in law enforcement or that Caido and

Morse shared this prevailing thought.  Consequently, there is

insufficient evidence that Caido or Morse used the August 28 and

29, 2006 filings of the applications for the criminal complaints

as a means to punish or as retribution against Boyle for the

public comments he made that were contrary to the prevailing

thought of law enforcement regarding a 2005 unsolved murder.

There is also insufficient evidence of an ulterior purpose in the

filing of the applications because Boyle addressed police

officers in a certain manner or because Caido or Morse sought

personal gain.  See Empire Today, LLC v. National Floors Direct,

Inc., 2011 WL 2161898, *8 (D.Mass. June 2, 2011) ("[a]n ulterior

purpose 'is not simply the intent to harm the other party

directly by bringing the suit'").

In addition to the foregoing, the complaint depicts the

defendants' ulterior purpose as using process "for personal

political vendetta and published name recognition."[35]  (Docket

Entry # 1, ¶ 68).  These statements fail to sufficiently connect

Caido or Morse to a political vendetta or connect the political

vendetta to the applications for criminal process that Caido and

---

[35]  Insofar as Boyle refers to using "the media Cape Cod
Times with the ulterior purpose, to wit, for personal political
vendettas and public condemnation of Boyle" (Docket Entry # 32, §
III(E)), the use of the media is not the use of process for an
ulterior purpose.

Morse initiated. Moreover, any use of process by Caido or Morse to gain name recognition or an unidentified political advantage does not provide sufficient evidence to withstand summary judgment that Morse or Caido acted with an ulterior purpose. See Stacey v. Stacey, 2006 WL 2848670, *5 (Mass.Super. Aug. 25, 2006) (finding no ulterior purpose even though "Mary's motives may not have been pristine and there may have been some measure of vindictiveness in her institution of the lawsuit"). In addition, both Caido and Morse initiated the applications for a criminal complaint based in part on information provided by an independent third party, Fisher or Verling.

The complaint also notes that defendants launched "multiple investigations" targeting Boyle "by use of confidential informants and electronic means designed to entrap Boyle." (Docket Entry # 1, ¶ 67). The investigations noted in the complaint as well as those identified by defendants, however, were not groundless. Geiler informed the police that King's Coach was operating without a valid 2006 permit in the Town of Barnstable. Fisher and Verling reported false charges on their credit cards. Furthermore, the use of confidential informants or electronic means are common investigatory tools. See United States v. Childs, 447 F.3d 541, 542 (7th Cir. 2006).

Boyle additionally cites the November and December 2006 letters he wrote or faxed to the Cape and Islands District

39

Attorney, the First Magistrate and the Cape and Islands Assistant District Attorney, which included the Board of Health citations, as well as the January 2009 response by the Cape and Islands Assistant District Attorney to support the abuse of process claim. (Docket Entry # 32, pp. 14-15). The November 2009 letter to the First Magistrate notes Caido's desire in the fall of 2006 not to drop the Board of Health matter. (Docket Entry # 33, Ex. 17). Caido's expressed desire for Green to continue proceeding[s] against Boyle (Docket Entry # 33, Ex. 18) does not, without more, translate into an ulterior purpose. See Psy-Ed Corp. v. Klein, 947 N.E.2d at 536 ("the desire to litigate a dispute, by itself, does not translate into an ulterior purpose for bringing the action, even when, as here, many of the claims were groundless"). Boyle also fails to causally connect the actions of the Board of Health with the actions of Caido, a member of the Barnstable Police Department. See Piccone v. McClain, 720 F.Supp.2d at 147 (dismissing abuse of process claim given attenuated chain of causation of ulterior motive based on one agency beginning investigation within a week of lawsuit involving second agency).

In sum, Caido and Morse are entitled to summary judgment given the absence of sufficient facts to allow a reasonable fact finder to find that Caido or Morse acted with an ulterior purpose. Accordingly, the abuse of process claim in Count Five

against Caido and Morse is subject to summary judgment.

V.   Libel, Slander and Defamation

_____Defendants next seek summary judgment on the libel, slander and defamation claims in Count Eight because:  (1) Boyle failed to identify any statements that amount to slander or libel; (2) the complaint fails to show any statements made by Klimm, Morse and Finnegan; (3) Caido's statement that he did not want "to drop anything" is privileged and/or does not establish defamation; and (4) Caido's and Morse's statements in the applications for criminal complaints are likewise privileged.  (Docket Entry # 26).  Captioned "Libel, Slander, Defamation," Count Eight alleges that the two articles in the Cape Cod Times contained inaccurate, false, malicious and libelous facts "of and concerning" Boyle that defendants knew or should have known were false.[36]  (Docket Entry # 1, ¶¶ 82-85).  The complaint additionally identifies Caido's statement to Green that he did not want "to drop anything."  (Docket Entry # 1, ¶ 37).  Boyle therefore relies on

_____

[36] Except possibly for the first argument, defendants do not distinguish between libel, slander and defamation in making their argument.  They primarily cite and rely on cases involving defamation claims.  (Docket Entry # 32, § III(E)).  "Defamation encompasses the torts of libel and slander-the one being in general written while the other in general is oral."  Draghetti v. Chmielewski, 626 N.E.2d 862, 867 n.4 (Mass. 1994).  This court limits the discussion to addressing only the arguments as presented.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (court cannot expected to do counsel's work).

both the articles in the Cape Cod Times and Caido's statement as the basis for the claims in Count Eight. (Docket Entry # 1, ¶¶ 37 & 82-85). In opposing summary judgment, Boyle maintains that defendants are responsible for the defamatory statements in the two Cape Cod Times articles and that the articles would not have existed but for defendants' unlawful acts. (Docket Entry # 32).

The two Cape Cod Times articles published on July 21 and September 8, 2006, describe the complaints made by Fisher, Verling[37] and other customers about charges for limousine services Boyle never provided. The articles also note complaints made by unpaid employees and the charges relating to both operating without a license or permit and failing to carry workers' compensation insurance. The September 8 article obliquely references Caido and Morse by referring to the criminal complaints for larceny and that Boyle "also faces charges of operating the business without a required town license." (Docket Entry # 33, Ex. 22; Docket Entry # 26, Ex. 8). With the exception of a reference to Finnegan seizing certain property after police took Boyle "into protective custody," the articles

_____

[37] The article does not refer to Verling by name. Rather, it states that, "Barnstable police brought forth a complaint from a Centerville man who told police he canceled two trips with King's Coach in July, but claims his credit card was still charged $141" (Docket Entry # 33, Ex. 22; Docket Entry # 26, Ex. 8), an amount almost identical to the $141.88 amount charged to Verling's credit card (Docket Entry # 26, Ex. 3).

do not identify any defendant by name.  The allegations attributed to members of the Barnstable Police Department include the following:  "Barnstable Police Department officials have also taken out four complaints against Boyle . . . for allegedly operating his company King's Coach without a livery license"; "Barnstable police pull[ed] over a King[']s Coach limo on Main Street" on July 10, 2006;[38] and "Barnstable Licensing Authority director Tom Geiler notified police in June that the company was in violation."  (Docket Entry # 33, Ex. 22; Docket Entry # 26, Ex. 7 & 8).

Turning to the first and second arguments, "Defamation encompasses the torts of libel and slander."  Draghetti v. Chmielewski, 626 N.E.2d at 867 n.4. "To withstand a motion for summary judgment for defamation, a plaintiff must show" inter alia that "[t]he defendant made a statement, concerning the plaintiff, to a third party."  Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510 (Mass. 2003).

The articles do not identify any statements made by Klimm and the reference to Finnegan concerns his seizure of property rather than any statements he made.  Accordingly, because the

---

[38]  The article similarly notes that, "On July 10 an officer found a King[']s Coach driver on Main Street waiting to take clients to a concert in Boston" and that "[t]he car was seized because it was unregistered at the time."  (Docket Entry # 33, Ex. 22; Docket Entry # 26, Ex. 7).

articles fail to identify statements made by Klimm or Finnegan concerning Boyle, both defendants are entitled to summary judgment for the defamation, libel and slander claims in Count Eight.  See Ravnikar v. Bogojavlensky, 782 N.E.2d at 510 (recognizing there must be statement made by a defendant concerning the plaintiff).

The articles also reference the charges against Boyle for operating King's Coach without a license and two criminal complaints against Boyle for larceny.  Even if the articles referenced statements made by Caido or Morse in the applications for the criminal complaint, such statements are absolutely privileged and cannot support a defamation claim.

"Statements made in the course of a judicial proceeding which pertain to that proceeding are . . . absolutely privileged and cannot support a claim of defamation, even if uttered with malice or in bad faith."  Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991).  "An application for a criminal complaint is generally considered as involving 'a form of judicial proceeding and the statements made therein are absolutely privileged.'"  Roselle v. Melrose Police Officer Crowley, 2005 WL 1155139, *5 (Mass.Super. March 31, 2005) (quoting Correllas v. Viveiros, 572 N.E.2d at 10); see also Chiras v. Right One, 2008 WL 2345797, *2 (Mass.Super. May 27, 2008) ("libel law is quite clear that there is a legal privilege to bring and to state both criminal and

civil charges, which defense is absolute"). The <u>Roselle</u> court
therefore found that the officer's "statements made in his
application for the criminal complaint against Roselle are
absolutely privileged." <u>Roselle v. Melrose Police Officer
Crowley</u>, 2005 WL 1155139 at *5 (allowing summary judgment). The
statements made by Morse and Caido in the applications for the
criminal complaints are therefore absolutely privileged. They
are therefore entitled to summary judgment on the defamation,
libel and slander claims in Count Eight to the extent Boyle based
these claims on the Cape Cod Times articles. <u>See</u> <u>Correllas v.
Viveiros</u>, 572 N.E.2d at 13 (affirming summary judgment on
intentional infliction of emotional distress claim in light of
absolute privilege afforded to the defendants for defamation
claim because "privilege which protect[s] an individual from
liability for defamation would be of little value if the
individual were subject to liability under a different theory of
tort").

Turning to Caido's statement to Green, the exhibit
containing the statement includes a series of entries made by
Green during the course of his investigation of King's Coach and
Boyle, its owner.[39] Green's notations for September 13, 2006
reflect that Caido spoke to Green and "Atty. Crowley" that he did
not "want us to drop anything on this John Boyle because

---

[39] See footnote 18.

everybody in the department knows all about him and his going ons."  (Docket Entry # 26, Ex. 9).

Defendants argue that Caido's statement to Green is absolutely privileged.  As previously noted, "Statements made in the course of a judicial proceeding" pertaining to the proceeding are "absolutely privileged and cannot support a claim of defamation, even if uttered with malice or in bad faith." Correllas v. Viveiros, 572 N.E.2d at 10.  This long standing rules applies to statements made by a witness, party or attorney. See Correllas v. Viveiros, 572 N.E.2d at 10 (noting "long-standing rule" that "statements made by a witness or party" receive "an absolute privilege against an action for defamation"); Sriberg v. Raymond, 345 N.E.2d 882, 883-884 (Mass. 1976) (applying absolute privilege to statements sent to the plaintiff's bank and to the plaintiff that attorney made accusing the plaintiff of misconduct and threatening a lawsuit).  "[M]any cases} exist, however, "which hold that the report of a crime is only conditionally privileged.  In most of those cases, however, the defendants went to the police, or communicated with others, on their own initiative and published an accusation which might otherwise never have been known."  Correllas v. Viveiros, 572 N.E.2d at 12.  The record fails to clarify the particular context for Caido's statement or the reason why Caido was present when he spoke to Green.  It is also not clear whether Caido sought out

Green to tell him not to drop anything or whether Caido or Green initiated the conversation.  Viewing the record in Boyle's favor, summary judgment on the defamation, slander or libel claim against Caido is therefore improper.  See generally Santosus v. Valley Free Radio, Inc., 2011 WL 2363512, *4 (Mass.App.Div. May 31, 2011) ("court must examine a challenged statement in its totality and in the context in which it was made" and consider "all the circumstances surrounding the statement").

Citing Correllas, defendants also contend that Boyle fails to establish that the statement is defamatory.  (Docket Entry # 32) ("[t]he only statement identified in the complaint" is Caido's and "there are no statements pled that are defamatory").  "Defamation is the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt."  Correllas v. Viveiros, 572 N.E.2d at 10.  "The test whether a publication is defamatory is whether, in the circumstances, the writing discredits the plaintiff 'in the minds of any considerable and respectable segment in the community.'"  Draghetti v. Chmielewski, 626 N.E.2d at 866 (quoting Tropeano v. Atlantic Monthly Co., 400 N.E.2d 847, 851 (Mass. 1980)).  Moreover, when "a communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury."  Draghetti v. Chmielewski, 626 N.E.2d at 866.  Here, Caido's statement is susceptible to both a defamatory and

nondefamatory meaning.  See, e.g., id., 626 N.E.2d at 866-867

(false statements to newspaper in which the defendant "'confirmed

that the allegations against . . . Draghetti were referred to the

district attorney's office after being checked out by the

department'" were susceptible of defamatory meaning and properly

submitted to jury).  Summary judgment is therefore inappropriate

based on the argument that "there are no statements pled that are

defamatory" (Docket Entry # 26, p. 12).

        In sum, Count Eight is subject to summary judgment except

for the claims against Caido based on the statement he made to

Green and Crowley that he did not want them "to drop anything on

this John Boyle because everybody in the department knows all

about him and his going ons."  (Docket Entry # 33, Ex. 18; Docket

Entry # 26, Ex. 9).

VI.  Intentional Infliction of Emotional Distress

        Defendants move for summary judgment on the intentional

infliction of emotional distress claim in Count Seven because

Boyle fails to establish any of the four elements of a prima

facie case.  (Docket Entry # 26, § III(F)).  Boyle disagrees with

respect to each of the four elements.  (Docket Entry # 32).

        In order to succeed on a claim of intentional infliction of

emotional distress, the plaintiff must show (1) "he suffered

'severe' emotional distress"; (2) the defendant either "'intended

to inflict emotional distress or he knew or should have known'"

48

his actions would cause emotional distress; (3) the defendant's behavior "'was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community'" and (4) causation.  <u>Kennedy v. Town of Billerica</u>, 617 F.3d 520, 530 & n.9 (1st Cir. 2010) (quoting <u>Howell v. Enterprise Publishing Co.</u>, 920 N.E.2d 1, 29 (Mass. 2010)); <u>accord</u> <u>Limone</u>, 579 F.3d at 94.  Severe emotional distress "means the kind of distress that 'no reasonable man could be expected to endure.'" <u>Kennedy</u>, 617 F.3d at 530 (quoting <u>Agis v. Howard Johnson Co.</u>, 355 N.E.2d 315, 319 (Mass. 1976)).  Emotional responses such as "'anger, sadness, anxiety, and distress,'" while "'blameworthy,' are 'often not legally compensable.'"  <u>Kennedy</u>, 617 F.3d at 530 (quoting <u>Quinn v. Walsh</u>, 732 N.E.2d 330, 338 (Mass.App.Ct. 2000)).

Beyond the conclusory statement that the emotional distress "was severe and of a nature that no reasonable man could be expected to endure" (Docket Entry # 1, ¶ 79), Boyle fails to provide sufficient facts that would allow a fact finder to find the requisite level of severity that no reasonable man could be expected to endure.  At best, Boyle proffers the foregoing accompanied by a generalized statement that he suffered and will continue to suffer "mental pain and anguish, severe emotional trauma, embarrassment, and humiliation."  (Docket Entry # 1, ¶ 81).  These conclusory statements are insufficient to avoid

summary judgment.  See Chiang v. Verizon New England Inc., 595
F.3d at 30 (noting requirement to ignore "'conclusory
allegations, improbable inferences, and unsupported speculation'"
on summary judgment); Triangle Trading Company, Inc. v. Robroy
Industries, Inc., 200 F.3d 1, 2 (1st Cir. 1999) (same); see,
e.g., Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir.
2000).  They also fail to demonstrate the degree of severe
emotional distress that Massachusetts caselaw demands.  Cf.
Kennedy, 617 F.3d at 530-531 (summarizing case[40] in parenthetical
that found sufficient severity where the plaintiff had evidence
"of severe depression, suicidal thoughts, and loss of sleep for
more than a month").

Defendants are also entitled to summary judgment given the
absence of facts to support a finding of extreme and outrageous
conduct.  Police officers who merely carry "out their obligations
as law enforcement officials and their conduct 'as a matter of
law cannot be deemed extreme and outrageous.  Neither applying
for an arrest warrant, nor making an arrest pursuant to an issued
warrant can be considered "utterly intolerable in a civilized
community."'"  Sietins v. Joseph, 238 F.Supp.2d 366, 379 (D.Mass.
2003) (quoting Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass.
1994)) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 145,

_____

[40] Homesavers Council of Greenfield Gardens, Inc. v.
Sanchez, 874 N.E.2d 497, 504 (Mass.App.Ct. 2007).

355 N.E.2d 315, 319 (1976)); accord Sena v. Commonwealth, 629 N.E.2d at 994 (affirming allowance of summary judgment because "[n]either applying for an arrest warrant, nor making an arrest pursuant to an issued warrant" amounted to extreme and outrageous conduct).

The intentional infliction of emotional distress claim is therefore subject to summary judgment because Boyle does not provide sufficient facts to allow a reasonable finder of fact to find in his favor relative to the existence of severe emotional distress or extreme and outrageous conduct on the part of defendants.  In light of this ruling, it is not necessary to address whether Boyle provides sufficient facts to withstand summary judgment on the intent and causation elements of intentional infliction of emotional distress.

VII.  Section 1983

Defendants next move for summary judgment on the 1983 claims (counts one, two and three) because Boyle fails to provide sufficient evidence of a violation of his constitutional or civil rights.  They also submit that the applications for the criminal complaints "were all based on probable cause."  (Docket Entry # 26).

To establish liability under section 1983, the plaintiff must show that "'(1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct

deprived the plaintiff of rights secured by the Constitution or law of the United States.'" Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151-52 (1st Cir. 2006). Boyle captions Count One as "retaliation for petitioning" in "violation of 42 U.S.C. § 1983." (Docket Entry # 1) (capitalization omitted). He submits that defendants retaliated against because he spoke "contrary to the prosecutors['] then prevailing thought of an ongoing murder investigation," i.e., the unsolved murder of Rein's wife. (Docket Entry # 1, ¶ 43). The retaliation took the form of subjecting Boyle to the inaccurate "and libelous media exposure," presumably consisting of the two Cape Cod Times articles in July and September 2006 about King's Coach operating without a license and identifying the larceny charges. Defendants also allegedly retaliated against Boyle by filing the two applications for the criminal complaints for the July 17 and August 16, 2006 offenses. Count One therefore presents a section 1983 claim based upon a retaliation for the exercise of Boyle's First Amendment rights.

The First Amendment provides a basis for a section 1983 retaliation claim. See Hartman v. Moore, 547 U.S. 250, 256 (2006) ("First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"). A retaliatory prosecution claim under section 1983, however, requires the plaintiff to show the absence of probable cause. See Hartman,

547 U.S. at 259-66; <u>Ligeri v. Rhode Island</u>, 2007 WL 3072061, *9 (D.R.I. Oct. 19, 2007) ("a plaintiff in a § 1983 retaliatory prosecution claim must prove a lack of probable cause").  The probable cause determination is made at the time Caido and Morse filed the applications for the criminal complaints.  <u>See</u> <u>Roche v. John Hancock Mutual Life Insurance Co.</u>, 81 F.3d 249, 254 (1st Cir. 1996) ("inquiry into the existence vel non of probable cause is not to be undertaken from the perspective of hindsight but from the perspective of a hypothetical 'reasonable man' standing in the reporting person's shoes at the time when that person acted").  The fact that Boyle later pled guilty or admitted to the sufficiency of the facts is not germane to the presence of probable cause on August 28 and 29, 2006.

Defendants argue that Caido and Morse "sought the criminal complaints against" Boyle based on probable cause.  (Docket Entry # 26, § III(G)).  As previously discussed in part III, Boyle fails to provide sufficient facts for a reasonable finder of fact to find that Caido or Morse acted without probable cause relative to the larceny charges.

Alternatively, even without a showing of the absence of probable cause, there is still an insufficient showing of a causal connection between the animus and the injury.  <u>See</u> <u>Hartman v. Moore</u>, 547 U.S. at 259 (a section 1983 "plaintiff must show a causal connection between a defendant's retaliatory animus and

subsequent injury in any sort of retaliation action").[41]  The
alleged animus against Boyle for speaking out about the murder in
a manner contrary to prevailing thought in law enforcement is not
a but for cause of filing the applications for the criminal
complaints charging larceny.  See Hartman v. Moore, 547 U.S. at
260 ("[i]t is clear, moreover, that the causation is understood
to be but-for causation, without which the adverse action would
not have been taken").  The police records undeniably establish
that independent third parties contacted the Barnstable Police
and provided evidence of King's Coach charging their credit cards
but not performing the limousine service.  The lack of a close
temporal connection between Boyle's speaking about the murder and
the filing of the larceny charges also weakens the causal
connection.  Summary judgment is therefore warranted on the First
Amendment retaliatory prosecution claim based on the larceny
charges.

    The summary judgment record, however, fails to provide
sufficient facts regarding the existence of probable cause for

---

    [41]  The Court in Hartman imposed the absence of probable
cause requirement for a section 1983 First Amendment retaliatory
prosecution claim as a means to address the difficulties of
proving causation when a police officer or investigator induces a
prosecutor to file criminal charges.  In such circumstances, "the
causal connection required here is not merely between the
retaliatory animus of one person and that person's own injurious
action, but between the retaliatory animus of one person and the
action of another."  Hartman v. Moore, 547 U.S. at 262.

the August 28 and 29, 2006 filings by Caido and Morse of applications for criminal complaints based on the violations of a municipal bylaw or ordinance for operating a business without a license in violation of section 21. Without more, Geiler's June 28, 2006 email itself does not establish probable cause as a matter of law for the July 17 and August 16, 2006 offenses. The summary judgment record does not describe what took place on July 17 or on August 16, 2006. Caido's and Morse's affidavits simply state they believed they had probable cause without providing any detail about the circumstances surrounding the July 17 and August 16, 2006 offenses or the facts at the time they filed the applications. Positing no other argument to support summary judgment of the First Amendment retaliatory prosecution claim relative to the two operating without a licenses charges in violation of section 21, this aspect of Count One remains viable.[42]

Defendants also fail to address the retaliation claim based on subjecting Boyle to the false Cape Cod Times articles published on July 21 and September 8, 2006, in violation of

---

[42] The deadline for filing a dispositive motion has passed. If there are facts to establish probable cause as a matter of law or if defendants have other arguments that merit summary judgment on this aspect of Count One, they should seek an extension of time to file a second summary judgment motion. This court expresses no opinion on the merits of a motion for an extension of time.

Boyle's First Amendment free speech to speak in a manner contrary to the prevailing thought in law enforcement.[43]  The contours of such a claim are well settled.  "First Amendment [c]laims of retaliation for the exercise of First Amendment rights are cognizable under 42 U.S.C. § 1983."  Rectrix Aerodome Centers, Inc. v. Barnstable Municipal Airport Commission, 632 F.Supp.2d 120, 131 (D.Mass. 2009); accord Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) ("[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983"); see also Hartman v. Moore, 547 U.S. 250, 256 (2006) ("[o]fficial reprisal for protected speech 'offends the Constitution because it

---

[43]  The complete failure to address this aspect of Count One extends to defendant's qualified immunity argument.  The qualified immunity argument focuses entirely on the retaliation based on the criminal proceedings, i.e., that Boyle pled guilty, that the officers had probable cause and that they did not arrest Boyle.  (Docket Entry # 26, pp. 18-19).  Although the deadline to file a dispositive motion has passed, qualified immunity provides an immunity from suit and an entitlement not to stand trial.

> "The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability."  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir.2009); see also Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (noting that qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation").

Costa-Urena v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009).  Accordingly, in the event defendants wish to press the qualified immunity doctrine, they should file a motion seeking an extension of the deadline to file a dispositive motions.

threatens to inhibit exercise of the protected right'"). In
order to establish a First Amendment retaliation claim, the
plaintiff "must show that [the plaintiff's] conduct was
constitutionally protected, and that [the plaintiff's] conduct
was a 'substantial factor' or a 'motivating factor' for the
defendants' retaliatory conduct." Rectrix Aerodome Centers, Inc.
v. Barnstable Municipal Airport Commission, 632 F.Supp.2d at 131
(internal brackets and ellipses omitted); see Hartman v. Moore,
547 U.S. at 256 ("when nonretaliatory grounds are in fact
insufficient to provoke the adverse consequences, we have held
that retaliation is subject to recovery as the but-for cause of
official action offending the Constitution"). Put another way,
to succeed on a "section 1983 First Amendment retaliation
claim[,] a plaintiff must demonstrate that he engaged in
protected speech, and that the speech was a substantial or
motivating factor in an adverse decision taken by the defendant."
Beechwood Restorative Care Center v. Leeds, 436 F.3d 147, 152
(2ⁿᵈ Cir. 2006) (section 1983 First Amendment retaliation suit
brought by nursing home operators and their business against
state and federal officials for engaging in series of inspections
and "trumped up allegations of deficiencies" in retaliation for
the plaintiff's exercise of protected speech that challenged the
regulatory findings and requirements). "Even if the plaintiff
demonstrates these factors, the defendant can still prevail on a

motion for summary judgment if it can show that it would have taken the same adverse action even in the absence of the protected conduct." Cotarelo v. Sleepy Hollow Police Department, 460 F.3d 247, 251-52 (2nd Cir. 2006); see Nestor Colon Medina & Sucesores, Inc. v. Custodia, 964 F.2d 32, 41 (1st Cir. 1992) (applying similar analysis to section 1983 First amendment claim alleging denial of permit in retaliation for exercising First Amendment rights); accord Collins v. Nuzzo, 244 F.3d 246, 252 (1st Cir. 2001) (noting, in the context of alleged denial of permit in retaliation for exercise of First Amendment rights, that "Board 'still prevails by showing that it would have reached the same decision in the absence of the protected conduct'"); Baker v. Coxe, 230 F.3d 470, 476 (1st Cir. 2000) ("dispositive ruling of the district court was that, even if plaintiff established the elements of retaliation, defendants proffered a satisfactory and unrebutted nonretaliatory reason for their actions"); see also Hartman v. Moore, 547 U.S. at 260 ("the causation is understood to be but-for causation, without which the adverse action would not have been taken" and if "the retaliation was not the but for cause the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's

mind").[44]  That said, because defendants fail to address this
First Amendment claim in Count One, it remains in this action.
See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.

Defendants also seek summary judgment because the Fourth
Amendment's requirement of a seizure dooms any section 1983 claim
grounded upon its protections.  Putting aside the failure of the
complaint to refer to the Fourth Amendment, a section 1983
malicious prosecution claim based on the Fourth Amendment
requires a showing that the plaintiff experienced a deprivation
of his liberty consistent with the concept of a seizure.  See
Britton v. Maloney, 196 F.3d 24, 30 (1st Cir. 1999); accord
Nieves v. McSweeney, 241 F.3d 46, 54-57 (1st Cir. 2001).  "Absent
any evidence that [the plaintiff] was arrested, detained,
restricted in his travel, or otherwise subject to a deprivation
of his liberty before the charges against him were dismissed, the
fact that he was given a date to appear in court is insufficient
to establish a seizure within the meaning of the Fourth
Amendment."  Britton v. Maloney, 196 F.3d at 30 (rejecting
section 1983 malicious prosecution claim); accord Nieves v.

---

[44]  This portion of the Hartman opinion was discussing the
features of a section 1984 retaliation claim resulting from an
public employee's speaking out in a manner critical to the
government.

<u>McSweeney</u>, 241 F.3d at 56 (same). Simply put, "the view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." <u>Nieves v. McSweeney</u>, 241 F.3d at 55; <u>see</u> <u>Britton v. Maloney</u>, 196 F.3d at 30. Here, Boyle was never arrested, detained or restricted in his travel and the obligation to appear in court does not equate with a seizure. A section 1983 malicious prosecution claim based on the Fourth Amendment, even assuming it is pled in the complaint, is therefore subject to summary judgment.[45]

Count One also refers to "equal protection" and the Fifth and Fourteenth Amendments. These conclusory references fail to avoid summary judgment relative to the violation of a constitutional right. <u>See</u> <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 414 (1st Cir. 2000); <u>Triangle Trading Company, Inc. v. Robroy Industries, Inc.</u>, 200 F.3d at 2. In the alternative, Boyle fails to establish sufficient facts of a constitutional violation with respect to each of the cited constitutional rights.

The Equal Protection Clause of the Fourteenth Amendment requires states to treat all similarly situated persons equally.

---

[45] Defendants also erroneously assert that the claims include the language "due process." No such allegation or language appears in the complaint.

<u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982); <u>see</u> <u>also</u> <u>Clark v.</u>
<u>Boscher</u>, 514 F.3d 107, 114 (1st Cir. 2008) (two persons "are
similarly situated if 'a prudent person, looking objectively at
the incidents complained of, would think them roughly equivalent
and the protagonists similarly situated "in all relevant
respects"'"). Boyle does not allege that defendants treated him
differently than non-white males. Rather, he claims economic
harms in the selective enforcement of the law targeted at him.
"[I]ndividual inequalities, as opposed to ones imposed
generically, are potentially-although not easily-reached by
so-called 'class of one' discrimination claims." <u>Rectrix</u>
<u>Aerodrome Centers, Inc. v. Barnstable Mun. Airport Com'n</u>, 610
F.3d 8, 15 (1st Cir. 2010). A cognizable class of one equal
protection claim requires a showing that the plaintiff "has been
intentionally treated differently from others similarly situated
and that there is no rational basis for the difference in
treatment." <u>SBT Holdings, LLC v. Town Of Westminster</u>, 547 F.3d
28, 34 (1st Cir. 2008) (internal quotation marks and citations
omitted). Determining whether two or more individuals or
entities are similarly situated entails asking "'whether a
prudent person, looking objectively at the incidents, would think
them roughly equivalent and the protagonists similarly
situated.'" <u>Id.</u> Here, Boyle fails to allege or set out facts
involving similar incidents or otherwise show facts indicative of

61

a selective enforcement.  There is no showing that Caido or Morse treated Boyle differently than other individuals by charging Boyle with larceny or violations of a municipal bylaw or ordinance for operating a business without a license.  Indeed, there is no evidence of any selective enforcement.  Failing to set out a viable equal protection claim, this constitutional right does not provide a basis for showing the necessary section 1983 constitutional violation.

As to the Fifth Amendment, Boyle fails to articulate the nature of the violation.  The Fifth Amendment, which is applicable to state actors by means of the Fourteenth Amendment,[46] Chavez v. Martinez, 538 U.S. 760, 780 n.1 (2003); Williamson v. Connors, 2010 WL 5058448, *2 (D.Colo. Dec. 3, 2010) ("Fifth Amendment is applied to the states through the Fourteenth Amendment"), provides that no person "shall be compelled in a criminal case to be a witness against himself."  U.S.Const. amend.V.; see also Spevack v. Klein, 385 U.S. 511, 514 (1967) ("Self-Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth" Amendment).  The facts, however, do not show that Boyle invoked his right to remain silent or that he was compelled to speak.  See generally Minnesota v. Murphy, 465

---

[46]  The Fifth Amendment in and of itself "only applies to the actions of the federal government."  Washington v. School Bd. of Hillsborough County, 731 F.Supp.2d 1309, 1321 (M.D.Fla. 2010).

U.S. 420, 427 (1984) (the Fifth Amendment "'speaks of
compulsion'" and it "'does not preclude a witness from testifying
voluntarily in matters which may incriminate him'"); Baxter v.
Palmigiano, 425 U.S. 308, 326 (1976) ("the privilege protects
against the use of compelled statements as well as guarantees the
right to remain silent absent immunity").  Furthermore, simply
charging Boyle with larceny or violations of a municipal bylaw or
ordinance does not rise to a Fifth Amendment violation.  See
Colon-Andino v. Toledo-Davila, 634 F.Supp.2d 220, 237 (D.P.R.
2009) (the plaintiffs "failed to satisfy the basic requirements
showing a Fifth Amendment violation because Colon-Andino was
never compelled to be a witness against himself" inasmuch as
Colon-Andino was only "charged for possession of a controlled
substance and that during the preliminary hearing, the charge
against him was dropped").

The Fourteenth Amendment fails to serve as a basis for Boyle
to maintain a section 1983 malicious prosecution claim.  "There
is no substantive due process right under the Fourteenth
Amendment to be free from malicious prosecution."  Roche v. John
Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996).
The availability of a state law claim for malicious prosecution
precludes a procedural due process violation.  See Nieves v.
McSweeney, 241 F.3d 46, 53 (1st Cir. 2001); Meehan v. Town of
Plymouth, 167 F.3d 85, 88 (1st Cir. 1999) (section "1983 claim

63

for malicious prosecution as a deprivation of procedural due process is barred where, as here, the state's tort law recognizes a malicious prosecution cause of action"); Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d at 256. Boyle's assertion of a conspiracy to hinder justice or to maliciously prosecute him does not avoid the need for him to show the violation of a constitutional right. See Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) ("fact that a plaintiff styles her claim as a conspiracy to prosecute her maliciously does not diminish her need to show a constitutional deprivation"). Finally, "the First Circuit does not recognize § 1983 claims based upon an alleged abuse of process." Faust v. Coakley, 2008 WL 190769, *4 (D.Mass. Jan. 8, 2008).

In sum, the section 1983 First Amendment claim in Count One for retaliatory prosecution based on the two violations of a municipal bylaw or ordinance for operating a business without a license that took place on July 17 and August 16, 2006, are not subject to summary judgment. The section 1983 First Amendment retaliation claim based on defendants' subjecting Boyle to the allegedly false and libelous media coverage with the two Cape Cod Times articles also remains in this action. The remaining section 1983 claims in Count One do not survive summary judgment given the absence of sufficient evidence for a reasonable finder of fact to find a constitutional violation.

Defendants next seek summary judgment on the section 1983 conspiracy claim in Count Two given the absence of an abridgment of any right and the lack of a conspiratorial agreement.  In order to establish a viable conspiracy claim under section 1983, a plaintiff "must show 'an actual abridgement of some federally-secured right.'"  Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 14 (1st Cir. 2003); accord Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) ("under section 1983 the plaintiff has to prove that 'there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws'"); Ousley v. Town of Lincoln through its Finance Director, 313 F.Supp.2d 78, 85 (D.R.I. 2004) ("[w]hatever the alleged wrong, be it false arrest, an illegal seizure, or malicious prosecution, a plaintiff alleging a § 1983 conspiracy must establish '" an actual deprivation of a right secured by the Constitution and laws"'").  The plaintiff must also establish a conspiratorial agreement.  Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) ("actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right").  A conspiracy is commonly defined as "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement

between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008); accord MacDonald v. Clark, 2008 WL 544857, *4 (D.N.H. Feb. 26, 2008) (same as applied to section 1983 conspiracy claim).

Notwithstanding Boyle's pro se status, it is his underlying "burden to identify the specific constitutional right infringed." Nieves v. McSweeney, 241 F.3d at 53. The constitutional rights Boyle identifies in Count Two are equal protection and the Fifth and Fourteenth Amendments. (Docket Entry # 1, ¶¶ 45-46). For the same reasons discussed above, Boyle fails to show sufficient facts for a reasonable finder of fact to find the abridgement of his right to equal protection or his rights under the Fifth and Fourteenth Amendments.

Boyle also fails to establish sufficient facts to support a conspiratorial agreement. The section 1983 conspiracy claim in Count Two therefore fails to withstand summary judgment given the failure to provide facts to show the abridgement of the federally secured rights Boyle identifies and/or to show a conspiratorial agreement among defendants.

Count Three alleges a section 1983 violation based upon a refusal or failure to prevent the harassment, malicious prosecution and conspiracy targeting Boyle in violation of the Fifth and Fourteenth Amendments. Defendants likewise seek

summary judgment of this section 1983 claim because of the absence of a constitutional violation.

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 197 (1989) (internal ellipses omitted). Insofar as Boyle attempts to set out a section 1983 claim on the basis that the police did not assist him or come to the aid of his family to prevent the lugs on his tires from being loosened, the license plates on King's Coach vehicles from being stolen, a car smashing through his office, a the burglarization of his office and/or threatening telephone calls (Docket Entry # 1, ¶¶ 40 & 47-52), the claim is subject to summary judgment due to the absence of a constitutional violation.

To the extent Count Three seeks to impose liability on Klimm for a failure to "instruct, supervise, control, and discipline" Caido, Morse and Finnegan (Docket Entry # 1, ¶¶ 48-49), there must be a showing of "'deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'" <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31, 49 (1st Cir. 2009). Defendants do not, however, adequately raise and address the failure to supervise claim against Klimm and it therefore remains in this

67

action at this point in time.[47]  Although Count Three references
the Fifth and Fourteenth Amendments, Boyle fails to provide
sufficient facts to survive summary judgment based on a violation
of the Fifth and Fourteenth Amendments for previously stated
reasons.

As a final matter and in addition to referencing section
1983, the caption of defendants' argument states that "civil
conspiracy Against the Individual Defendants Must Fail."  (Docket
Entry # 26, § III(G)).  Count Six sets out a common law civil
conspiracy claim and "defendants move to have all counts and
claims dismissed" (Docket Entry # 26).  The discussion under the
caption, however, only addresses liability under sections 1983
and 1985(3).  It does not refer to the common law conspiracy
claim in Count Six or set out any law relative to this common law
claim.[48]  Rather, the argument challenges the viability of the
section 1983 and section 1985(3) claims and not the common law
civil conspiracy claim.  "It is not enough merely to mention a
possible argument."  Charter Communications Entertainment I, DST
v. Burdulis, 460 F.3d 168, 183 (1st Cir. 2006) (quoting United
States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), in

_____

[47]  See footnote 24.  The section 1983 allegations against
the Town of Barnstable in Count Three fail due to the absence of
a policy or custom as discussed in part II.

[48]  Massachusetts common law recognizes two types of civil
conspiracies.  Kurker v. Hill, 689 N.E.2d 833, 836 (Mass.App.Ct.
1998).

parenthetical). Where, as here, defendants refer at most to "civil conspiracy" in a caption, they have not adequately developed an argument to support a dismissal of the common law conspiracy claim which is therefore waived. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); York v. Day Transfer Co., 525 F.Supp.2d 289, 301 (D.R.I. 2007) (the "[plaintiffs failed in their obligation to research, develop, and assert any argument as to the negligent brokerage and bailee claims, and it is not this Court's role to 'cast about blindly' for a basis" to deny the motion); see, e.g., Baillargeon v. Drug Enforcement Administration, 638 F.Supp.2d 235, 237 (D.R.I. 2009).

VIII.   Section 1985

Defendants move for summary judgment on the section 1985 claim (Count Two) again because Boyle did not establish deprivation of a federally protected right. (Docket Entry # 26, § III(G)). Boyle submits that defendants, in concert with the Cape Cod Times, engaged in a conspiracy to prosecute Boyle for crimes they knew he did not commit. (Docket Entry # 32, § III(G)).

In order to state a cause of action arising under section 1985(3), a plaintiff must assert (a) racial or class-based discrimination; and (b) interference with a federally protected

69

right.  See Liberatad v. Welch, 53 F.3d 428, 446-48 (1st Cir.
1995) (citing Bray v. Alexandria Women's Health Clinic, 506 U.S.
263 (1993)); Petricca v. City of Gardner, 429 F.Supp.2d 216, 222-
23 (D.Mass. 2006); Canney v. City of Chelsea, 925 F.Supp. 58, 68
(D.Mass. 1996) (citing Griffin v. Breckenridge, 403 U.S. 88, 102
(1971)).  Additionally, a claim of conspiracy must allege facts
that suggest a conspiracy rather than set out conclusory
allegations that the defendants made an unlawful agreement.  See
Bell Atlantic Corp., 550 U.S. at 556; DM Research v. Coll. of Am.
Physicians, 170 F.3d 55, 56 (1st Cir. 1999) (allegations of
conspiracy or agreement are insufficient to survive motion to
dismiss without additional factual support); see, e.g.,
Moreno-Perez v. Toledo-Davila, 764 F.Supp.2d 351, 358 (D.P.R.
2011) (allowing summary judgment on section 1985(3) claim because
"'failure to allege a conspiracy' with sufficient particularity
'defeats a cause of action under § 1985(3)'").

Boyle is a white male and does not suggest that he belongs
to a protected class.  Hence, there is an absence of evidence
suggesting the requisite class based animus in a section 1985
claim.  The constitutional rights he identifies in Count Two are
the right to equal protection and to be free of violations of the
Fifth and Fourteenth Amendments.  For previously stated reasons,
Boyle has not stated facts underpinning a violation of the Fifth
and Fourteenth Amendments or the interference with the federal

right to equal protection.  In addition, other than conclusory
assertions, Boyle also does not set out sufficient facts that
suggest a conspiracy or agreement.  See Moreno-Perez v.
Toledo-Davila, 764 F.Supp.2d 351, 359 (D.P.R. 2011) (allowing
summary judgment on section 1985 claim given conclusory
allegations); see also Nieves v. University of Puerto Rico, 7
F.3d 270, 280 (1st Cir. 1993) (assertions "in motion papers,
memoranda, or briefs are generally not sufficient to generate a
trialworthy issue").  Instead, Boyle cites evidence that Caido
encouraged Green to prosecute him and that Caido indicated the
Barnstable Police Department was interested in Boyle.  (Docket
Entry # 1, ¶ 37; Docket Entry # 33, p. 44; Docket Entry # 32, §
III(G)).[49]  The statement to Green, without more, does not
provide sufficient facts to show a conspiracy or illicit
agreement.  The record also belies any conspiratorial agreement
"to bypass an evidentiary magistrate[']s hearing and proceed
right to arraignment" (Docket Entry # 1, ¶ 35).  The section
1985(3) claim in Count Two is therefore subject to summary
judgment because Boyle does not allege facts supporting class-
based discrimination, interference with the alleged federally
protected rights in Count two or a conspiracy.  See Torres-Rosado
v. Rotger-Sabat, 335 F.3d 1, 14 (1st Cir. 2003) ("Plaintiff

---

[49]  See the next footnote.

cannot resuscitate her failed constitutional claims to prove conspiracy [under section 1985]").

IX. <u>Qualified and Conditional Immunity</u>

Defendants move to dismiss the section 1983 claims because they assert the individual defendants are entitled to qualified immunity. With the exception of the First Amendment retaliatory prosecution section 1983 claim relative to the two operating without a licenses charges in Count One, the First Amendment retaliation claim based on subjecting Boyle to the false and libelous media coverage with the two Cape Cod Times articles in Count One and the supervisory liability claim against Klimm in Count Three, the allowance of summary judgment on all of the remaining section 1983 claims against Klimm, Finnegan, McDonald, Murphy, Caido and Morse moots the qualified immunity argument.

Beyond setting out the law, defendants' qualified immunity consists of a single paragraph. Defendants argue that the police did not arrest Boyle but instead sought criminal complaints. They incorrectly assert that "Boyle pled guilty to the ordinance violations" when he only pled guilty to one of the ordinance violations. They summarily state that "defendants acted reasonable[sic]." They also maintain that, "the officers relied on the statements of civilians when they sought criminal

charges"[50] and "[c]learly they had probable cause."  (Docket
Entry # 26, § III(I)).

The qualified immunity argument is bereft of any reference
to the supervisory liability of Klimm (Count Three) and the First
Amendment retaliation claim based on the July and September 2006
Cape Cod Times articles.[51]  Accordingly, the argument is not
adequately raised.  See Higgins v. New Balance Athletic Shoe,
Inc., 194 F.3d at 260.

In the context of the remaining section 1983 claim in Count
One, the argument posits that Boyle pled guilty, Caido and Morse
acted reasonably and they had probable cause for the ordinance
violations.  Qualified immunity protects police officers such as
Caido and Morse "'from liability for civil damages insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'"  Mlodzinski v. Lewis, 2011 WL 2150741, *6 (1st Cir. June
2, 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).
Determining entitlement to qualified immunity entails
determining:  "(1) whether the facts alleged or shown by the
Plaintiff make out a violation of a constitutional right; and (2)
if so, whether the right was clearly established at the time of

---

[50]  This argument only applies to the already dismissed
section 1983 claims based on the larceny charges.

[51]  See footnote 38.

the defendant's alleged violation." Estrada v. Rhode Island, 594 F.3d 56, 62-63 (1st Cir. 2010) (internal quotation marks and brackets omitted); see also Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (discussing Pearson and adhering to "the Court's two-part test" thereby abandoning First Circuit's previously employed three step analysis). The second prong involves considering "two subsidiary issues," to wit, "(a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case-in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the Plaintiff's constitutional rights.'" Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010). "Together, these two factors ask whether a reasonable officer, similarly situated, would have believed that his conduct did not violate the Constitution." Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011).

Where, as here, the qualified immunity analysis arises at the summary judgment stage, there is a tension because the summary judgment standard "requires absolute deference to the nonmovant's [facts]" whereas the qualified immunity analysis "demands deference to the reasonable, if mistaken, actions of the movant." Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009). In order to keep these standards distinct, a court first

identifies "the version of events that best comports with the summary judgment standard and then ask[s] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id.; see also Buchanan v. Maine, 469 F.3d 158, 168 (1st Cir. 2006) ("the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation").

The version of events that best comports with the summary judgment record is that on May 9, 2005, the wife of Five Star's owner was found murdered. Media outlets, including the Cape Cod Times, became interested in the story and contacted Boyle, who gave scenarios that "ran counter to prevailing thought in law enforcement." (Docket Entry # 1, ¶¶ 6, 10 & 11). Boyle does not provide the date[s] he gave these scenarios or the dates when the media outlets published his comments.

On August 18, 2005, Boyle purchased Five Star. The Cape Code Times continued to run stories about the murder. Boyle therefore asked a reporter to stop mentioning Five Star because it hurt the business. The Cape Cod Times reporter agreed.

On the one year anniversary of the murder on May 9, 2006, the Cape Cod Times ran a feature story about the murder. The feature included the amount Boyle paid to purchase Five Star, which he sold on May 1, 2006.

On June 28, 2006, Geiler, the licensing agent for the Town

of Barnstable, sent an email to Sergeant Sweeney of the Barnstable Police Department.  The email informed Sweeney that King's Coach limousines did not have valid 2006 permits.  Geiler also instructed Sweeney to make the patrol force aware that King's Coach vehicles did not have valid 2006 permits and to stop such vehicles to determine "where they were operating from or who is running the company if not Mr. Boyle."  (Docket Entry # 26, Ex. 1).  Caido filed an application for a criminal complaint against Boyle on August 9, 2006, for the offenses of violating a municipal bylaw or ordinance by operating a business without a license on July 10 and 21, 2006, in violation of section 21. This application preceded the filing of the August 28 and 29, 2006 applications.  The alleged offenses in the latter applications for operating a business without a license in violation of a municipal bylaw or ordinance in violation of section 21 took place on July 17 and on August 16, 2006.

The summary judgment record is devoid of evidence as to what took place on either July 17 or August 16, 2006.  On September 13, 2006, Caido told Green and Crowley that he did not want them "to drop anything on" John Boyle.  (Docket Entry # 33, Ex. 18). On February 20, 2007, Boyle plead guilty to the operating a business without a license offense committed on July 17, 2006.[52]

_____

[52]  Pleading guilty to an offense generally bars a section 1983 claim that calls into question the validity of the conviction.  The Supreme Court in <u>Heck v. Humphrey</u>, 512 U.S. 477

The court continued the matter without a finding and eventually dismissed the action at the end of the probationary period. Boyle did not plead guilty to the operating a business without a license offense committed on August 16, 2006. The court continued the matter without a finding after Boyle admitted to sufficient facts and eventually dismissed the action at the end of the probationary period.

Turning to the first prong of the qualified immunity analysis, the facts alleged do not make out a violation of the First Amendment retaliation claim for filing the operating

---

(1994), held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

Id. at 486-487. The Heck analysis applies to section 1983 First Amendment retaliatory prosecution claims. See Subgidio v. Graiani, 2006 WL 648229, *10 (S.D.N.Y. March 16, 2006) (dismissing section 1983 malicious prosecution claim based on Heck); Duamutef v. Morris, 956 F.Supp. 1112, 1116 (S.D.N.Y. 1997) (dismissing section 1983 First Amendment retaliation claim in light of Heck).
    The fact that Boyle pled guilty to the July 17, 2006 operating without a license offense on February 20, 2007, however, is irrelevant to the probable cause inquiry which is based on the totality of the circumstances at the time of the August 28, 2008 filing of the application.

without a license in violation of section 21 charges for the July 17 and August 16, 2006 offenses. In order to succeed, there must be a showing that the plaintiff's exercise of his free speech was "a 'substantial factor' or a 'motivating factor' for the defendants' retaliatory conduct." Rectrix Aerodome Centers, Inc. v. Barnstable Municipal Airport Commission, 632 F.Supp.2d at 131; see also Hartman v. Moore, 547 U.S. at 259 (section 1983 "plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action"). There must also be a showing of but for causation. See Hartman v. Moore, 547 U.S. at 260 ("the causation is understood to be but-for causation, without which the adverse action would not have been taken"). Thus, "If there is a finding that retaliation was not the but-for cause of the [retaliatory conduct], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." Hartman v. Moore, 547 U.S. at 260.

Thus, the fact that a police officer harbored some retaliatory animus does not violate an individual's First Amendment rights. Instead, a constitutional violation takes place only where the retaliatory animus was a but for cause for criminal proceeding without which there would have been no such prosecution. Given the constitutional violation at issue of a

First Amendment retaliatory prosecution, animus and causation are inevitably intertwined with the qualified immunity analysis.  See Mihos v. Swift, 358 F.3d 91, 105 (1st Cir. 2004) (noting that "a defendant might prevail on a qualified immunity defense in a case alleging an intent-based constitutional tort, without need to inquire as to her motives, if . . . the defendant showed that she would have reached the same decision even in the absence of the employee's protected speech"); Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 97 (1st Cir. 2003) ("employee's First Amendment right to be free from political discrimination is violated when the employer's adverse employment decision is motivated by the employee's political speech" and "employer's subjective motive is an essential element of the constitutional violation itself, and cannot be divorced from the qualified immunity inquiry").

Here, there must be a causal connection between the alleged retaliatory animus against Boyle for speaking out about the murder contrary to the prevailing law enforcement view and the August 28 and 29, 2006 filing of the applications for a criminal complaint for operating a business without a license in violation of a municipal bylaw or ordinance in violation of section 21.  In light of Geiler's email, the Barnstable police knew that King's Coach did not have valid 2006 limousine permits.  It is not so apparent that they knew about Boyle speaking out about the murder in a manner contrary to the prevailing law enforcement view.  The

79

fact that Caido did not want Green to drop a proceeding
investigating a lack of workers' compensation insurance on
September 13, 2006, may raise an inference of some retaliatory
animus two weeks earlier but it is not enough to find a First
Amendment violation in the case at bar.  See generally Hartman v.
Moore, 547 U.S. at 260 (unless there is but for causation, there
is no causal connection "despite proof of some retaliatory animus
in the official's mind").  The only reasonable assumption to draw
from the summary judgment facts is that the bulk of the
publications of Boyle's remarks that ran contrary to the
prevailing law enforcement view took place in May 2005 and in the
months following the May 2005 murder.  Viewing the record in
Boyle's favor, this court will assume that the May 9, 2006
anniversary feature also published Boyle's scenario that ran
contrary to the prevailing law enforcement view.  Even then,
however, it was not until almost four months later than Caido and
Morse filed the applications for the criminal complaints.

    The time period between Boyle speaking out in a manner
contrary to prevailing law enforcement and the August 28 and 29,
2006 filings attenuates the causal connection as does the absence
of evidence to show Caido and Morse's involvement in the murder
investigation.  While it is true that circumstantial evidence may
suffice to show a retaliatory animus, the record does not contain
sufficient facts that Caido's and Morse's alleged animus against

Boyle for making the statements about the May 2005 murder was a
substantial or motivating factor in their decisions to file the
applications on August 28 and 29, 2006.  In any event, the
evidence of a legitimate basis for the applications, i.e., the
reasonable belief that Boyle was operating the business without a
permit for 2006, rebuts any showing that animus was a substantial
or motivating factor.  Indeed, the record fails to include
sufficient facts indicating Caido or Morse would not have filed
the applications but for Boyle's contrary comments to media
outlets.

    As to the second prong, it was clearly established in July
and August of 2006 "that as a general matter the First Amendment
prohibits government officials from subjecting an individual to
retaliatory actions, including criminal prosecutions, for
speaking out."  Hartman v. Moore, 547 U.S. at 256.[53]  It was also
clearly established in August 2006 that a First Amendment
retaliatory prosecution claim under section 1983 required a
showing of the absence of probable cause.[54]  Hartman v. Moore,

_____

    [53]  The Supreme Court decided Hartman on April 26, 2006,
several months prior to the alleged misconduct.

    [54]  The Court in Hartman nevertheless noted that because a
prosecutor would be absolutely immune, the First Amendment
retaliatory prosecution claim would be brought against a
nonprosecutor defendant such as a policeman who, bent on
retaliation, induced or influenced the prosecutor to bring the
criminal charges.  Hartman v. Moore, 547 U.S. at 261-262.  It is
undisputed that Caido and Morse were the police prosecutors who
allegedly had the retaliatory animus.  As such, the justification

547 U.S. at 262.  The requirement of a showing of but for

causation was also clearly established.  See Hartman v. Moore,

547 U.S. at 260.  As long as retaliatory animus against Boyle for

speaking out was not a but for cause of the filing of the

applications without which there would have been no criminal

prosecution, then there was no violation of the  First Amendment

for a retaliatory prosecution.  See Hartman v. Moore, 547 U.S. at

260 ("the causation is understood to be but-for causation,

without which the adverse action would not have been taken").

A reasonable police officer in either Caido's or Morse's

shoes would not have understood that his conduct violated Boyle's

First Amendment rights.  Boyle' speech contrary to the prevailing

law enforcement view took place at a different time than the

August 28 and 29, 2006 prosecutions.  In light of Geiler's email,

Barnstable police had a legitimate and reasonable belief that

Boyle was operating the business without a valid 2006 license in

violation of the Town Rules and Regulations thereby violating

section 21.  A reasonable police officer would not have

understood that the desire to retaliate against Boyle for

speaking to media outlets in a manner contrary to the prevailing

---

for the requirement to show the absence of probable cause is not
as strong as it would be if Caido and Morse were acting in the
customary roles of police officers investigating and reporting a
crime to a prosecutor who then makes an independent decision to
file charges.  Irrespective, however, there must be a but for
causal connection.  Hartman v. Moore, 547 U.S. at 260.

law enforcement view about a May 2005 murder was a but for cause of filing the applications on August 28 and 29, 2006. A reasonable police officer, similarly situated to Caido and Morse, would have believed that his conduct in filing the applications on August 28 and 29, 2006, did not violate Boyle's First Amendment rights.

Defendants next assert a conditional privilege applies to the libel, slander and defamation claims to the extent based on the statement Caido made to Green and Crowley. (Docket Entry # 26, p. 19) (citing Draghetti v. Chimelewski, 626 N.E.2d 862, 867 (Mass. 1994), and Mulgrew v. City of Taunton, 574 N.E.2d 389, 391-392 (Mass. 1991)). As noted above, Count Eight survives summary judgment with respect to the claims against Caido based on the statement to Green and Crowley that he did not want them "to drop anything on this John Boyle because everybody in the department knows all about him and his going ons." (Docket Entry # 1, ¶ 37; Docket Entry # 33, Ex. 18; Docket Entry # 26, Ex. 9).

As demonstrated by the two cases defendants cite, Massachusetts law creates a conditional privilege for "[s]tatements made by public officials while performing their official duties." Mulgrew v. City of Taunton, 574 N.E.2d at 392. The availability of the privilege therefore depends upon whether Caido had an official duty to discuss the matter. See Burke v. Town Of Walpole, 405 F.3d 66, 94 (1st Cir. 2005) ("the

availability of such a qualified privilege turns on whether Chief Betro had an official duty to discuss Burke at a meeting of concerned citizens").  The privilege "is designed to allow public officials to speak freely on matters of public importance in the exercise of their official duties."  <u>Draghetti v. Chimelewski</u>, 626 N.E.2d at 867.  The defendant loses the privilege, however, if he acts with actual malice "or unless there is 'unnecessary, unreasonable or excessive publication,' and the plaintiff establishes that the defendant published the defamatory information recklessly."  <u>Mulgrew v. City of Taunton</u>, 574 N.E.2d at 391; <u>see</u> <u>Vigoda v. Barton</u>, 204 N.E.2d 441, 446 (Mass.1965) ("[w]here the official believes the matter to be true and has not acted with actual malice or with reckless indifference to the rights of the individual citizen, his conditional privilege is not abused") (citations omitted); <u>Executive Bd. of Local 403 of International Brotherhood of Police Officers v. Barrett</u>, 1998 WL 755306, *6 (Mass.Super. Oct. 19, 1998) ("public official is conditionally privileged to make otherwise defamatory statements while performing public duties, as long as the official does not act with malice").

The particular context for Caido making the statement is not clear.  It is also not clear why Caido was present when he spoke to Green.  A genuine issue of material fact therefore exists regarding whether Caido made the statement while performing an

official duty.  Summary judgment on the basis of the conditional

privilege applicable to a common law defamation claim under

Massachusetts law for public officials performing their official

duties is not appropriate.[55]


## CONCLUSION

The motion for summary judgment (Docket Entry # 25) is

**ALLOWED** in part and **DENIED** in part.  Chief McDonald and Murphy

are dismissed.  The section 1983 claims are dismissed against the

Barnstable Police Department and the Town of Barnstable.  All of

the counts are dismissed except for:  (1) Count Six against all

defendants; (2) the portion of Count Eight against Caido based on

the statement to Green and Crowley that he did not want them "to

drop anything"; (3) the portion of Count One based on the First

Amendment retaliatory prosecution claim relative to the two

operating without a licenses charges;[56] (4) the portion of Count

One setting out a First Amendment retaliation claim based on

---

[55]   To state the obvious, this privilege is different from
the qualified immunity defense that applies to the section 1983
claims of the individual defendants.

[56]   The section 1983 claims in the complaint do not seek
injunctive relief.  Rather, they seek monetary relief in the form
of $1,000,000 in compensatory damages and $100,000 in punitive
damages.  Defendants are entitled to qualified immunity as to the
portion of Count One based on the First Amendment retaliatory
prosecution claim relative to the two operating without a
licenses charges.

defendants' subjecting Boyle to the allegedly false and libelous media coverage with the two Cape Cod Times articles remains in this action; and (5) the supervisory liability claim against Klimm and the Town of Barnstable in Count Three.[57]  This court will conduct a status conference on October 6, 2011, at 2:30 p.m.

  /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[57]  The deadline for filing a dispositve motion is passed. Accordingly, defendants will require an extension of the deadline in order to file a second summary judgment motion to address these remaining claims prior to any trial.  This court expresses no opinion on the merits of such a motion.